Commonwealth *v.* Matteo, Appellant.

Argued November 15, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*William A. Gray,* for appellant.

*Earl Jay Gratz,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., March 18, 1938:

In one of the outlying sections of the City of Philadelphia, Old York Road, 44 feet in width, running north and south and carrying double street car tracks, intersects at right angles Stenton Avenue, an east and west street 60 feet in width. During the summer of 1936 Stenton Avenue was the through street and flashing stop signs were installed on York Road near the south-

east and northwest corners of the intersection; the one protecting Stenton Avenue from northbound traffic on York Road was located along the east curb of that street, 28 feet south of the south curb of Stenton Avenue. No buildings were erected on any of the four corners of this intersection, but billboards were constructed on the vacant lots at the southeast and southwest corners; they obscured, temporarily, the view of York Road from pedestrians and automobile drivers approaching the intersection in either direction along Stenton Avenue. These billboards were placed at an angle with the curb lines of both streets and the corners nearest the curbs were approximately 20 feet from each curb, so that drivers approaching the intersection from either direction upon Stenton Avenue could have a clear view of several hundred feet south along York Road before entering into the intersection, and persons driving north on York Road would have a similar view along Stenton Avenue.

About noon on Sunday, August 2, 1936, a clear and dry day, Joseph Ronciglione was driving his Pontiac sedan eastwardly on the south side of Stenton Avenue intending to cross over York Road. He had as passengers in his car his little daughter and his brother, Perry Ronciglione. At approximately the same time Michael Matteo, the appellant, was driving his brother's Buick sedan northwardly on York Road intending to cross over Stenton Avenue. Matteo had six passengers in his car, two of whom, Miss Anna Panco and her young brother, Edward, were riding in the front seat with him. In the rear seat were two adults, Mrs. Anna Panco, Anna Winek, her sister, and two young children. These cars collided in the intersection at a point on the northbound or eastern trolley track, a few feet southeast of the center, with such force that both cars were overturned and practically demolished. Perry Ronciglione was thrown out of the Pontiac car and

killed instantly; Anna Winek, one of the passengers in the Buick car, was so seriously injured that her death resulted three days later.

At the September Sessions, 1936, of the court below a bill of indictment was submitted to the grand jury at No. 947, charging Matteo with the crime of involuntary manslaughter in causing the death of Perry Ronciglione, and a separate bill was presented at No. 948, charging him with the same offense in causing the death of Anna Winek. A true bill was returned in each case. When Matteo was called for trial he entered pleas of not guilty and, with the consent of the presiding judge, MILLAR, J., and the district attorney, elected, through his counsel, to be tried by the judge without a jury. On December 11, 1936, the trial judge found Matteo guilty in each case and after overruling his motions for a new trial sentenced him to imprisonment in the Philadelphia County prison for a term of one year at No. 947 and to the same term of imprisonment at No. 948, to run concurrently with the sentence at No. 947. We now have Matteo's appeal in each case; they will be disposed of in one opinion as the questions involved are identical.

The assignments relate to the admission of certain evidence, the refusal of a new trial, and the entering of the sentences.

The Commonwealth was not required to show that the driver of the Pontiac car was free from contributory negligence; but it had the burden of showing beyond a reasonable doubt that Matteo committed an unlawful act, not amounting to a felony,—for instance, operated his care at a speed in excess of the statutory maximum or disregarded a "stop sign," erected in accordance with the provisions of the statute or a city ordinance for the purpose of preventing collisions with cars proceeding upon through highways,—or an act or acts not merely careless but also so rash and reckless

as to approximate unlawfulness, and that the unintended deaths of Perry Ronciglione and Anna Winek resulted from his acts: *Com. v. Gill,* 120 Pa. Superior Ct. 22, 35, 36, 182 A. 103; *Com. v. Mayberry,* 290 Pa. 195, 138 A. 686; *Com. v. Ochs,* 91 Pa. Superior Ct. 528; and *Com. v. Godshalk,* 76 Pa. Superior Ct. 500. It was conceded that the death of each passenger was attributable to the injuries received at the time of the collision.

The grounds upon which the Commonwealth undertook to hold appellant responsible for their deaths was that he paid no attention to the sign reading, "Stop, Then Go When Safe," but without any regard for consequences, to himself or others, drove his car past it and into the intersection at such a rash and reckless rate of speed that the collision was inevitable.

As the trial progressed it boiled itself down to the issue of fact whether appellant stopped at the sign and waited until the intersection was clear of traffic passing on Stenton Avenue. His defense was that he stopped at the sign, looked to his left, saw no car approaching upon Stenton Avenue from the west, drove slowly into the intersection, and was struck on the left side of his car by the Pontiac before he had reached the center of the avenue.

The earnest and able argument of counsel for appellant is directed largely to the proposition that certain testimony should not have been accepted as a foundation for findings by the trial judge, because of its alleged incredible and improbable character.

It is not within the province of this court to pass upon the credibility of the witnesses, consider the testimony de novo, and reach an independent conclusion upon it. When a defendant agrees in a case of this kind to be tried by a judge without a jury the findings of the judge are as binding upon us as the verdict of a jury, if supported by competent evidence, regardless of

whether we would independently have made the same findings: *Wilson v. Malenock,* 128 Pa. Superior Ct. 544, 551, 194 A. 508, and the numerous cases there cited.

The testimony of the drivers of the respective cars was competent, but irreconcilably conflicting. One of them testified falsely. It is not for us to decide which one was worthy of belief. That question was for the judge who saw as well as heard them.

From a consideration of all the evidence the trial judge found these facts: "The defendant, at the time of the accident, was driving about fifty miles per hour; that he did not slow down nor stop at the 'Stop Sign' which was located about 28 feet south of the south curb line of Stenton Avenue on Old York Road, but continued across the intersection at the above rate of speed; that the accident was the proximate result of the negligent, careless and reckless operation of the defendant's vehicle, and that defendant was therefore guilty of involuntary manslaughter. . . . . . . The defendant's conduct was not merely negligent but also rash and reckless."

The only questions of law involved upon this appeal are whether there was competent evidence to sustain those findings and whether the law was properly applied to them. No question was raised with respect to the competency of the testimony of Joseph Ronciglione, the driver of the Pontiac car. His version of the accident, as taken from his direct testimony, reads: "Q. Now, then, suppose you tell us, without further questioning from me, just what happened. A. We had been to Ogontz Avenue and Stenton Avenue to buy a bolt for our back tire, and we were on our way home, going east on Stenton Avenue. About a hundred or more feet from Stenton Avenue there is a lot there and I could see, due to the bend in York Road, approximately 800 feet or more [south on] York Road. . . . . . . south of Stenton Avenue, that is right. It was at this point I

noticed an automobile coming at quite a fast rate of speed. I didn't pay any particular attention to it, I just kept on going. When I got about fifteen feet from the curb line of York Road and Stenton Avenue I noticed this car was about the intersection of Godfrey Avenue, [which intersects but does not cross York Road] that would be approximately three hundred feet away from Stenton Avenue and York Road. I proceeded on. I slowed up and proceeded on. As I got to the corner I glanced north of me, that is, to the left of me, looking up York Road, and there was a car stopped there for the stop sign on York Road. There is a stop sign on both the north and south curb. Q. There was a car stopped—that had come to a stop? A. Yes, there was a car stopped at York Road and Stenton Avenue, and I proceeded across. I seen this car coming and it didn't seem as like it was coming as fast as he had, and then it seemed like he was slowing up and was going to stop for the stop sign, so I started across York Road. As I started across York Road—Q. At that point when you started across, how far away was the defendant's car from the intersection? A. I would say two hundred feet or more. Q. Go ahead, you started across then? A. I started across York Road and there was something on the north side of York Road that attracted my attention for a second or so and I was looking over in that direction when I heard my brother shout, 'Watch out, Joe.' I turned around. I turned and saw this car coming on York Road wasn't going to stop for the stop sign at the rate of speed he was going. I tried to avoid the accident by cutting the wheels to the left of me and applying my brakes as I did so. This car seemed to try to get around me, zigzagging sort of, and the cars came together. It was the left side of his car that either struck the front side of our car—the front right side. Q. Let me have that again. I am sorry, that was my fault. It was the left side of the defend-

ant's car that either struck the front right side of your car? A. That is right. And as it did so I felt myself being dragged. Of course I was knocked over as the crash happened, and I felt myself being dragged and spun around. As I could gather my sense after the car rested, I rolled to a rest in the car."

This witness also testified he had been driving on Stenton Avenue "between 20 and 25 miles an hour" until he approached within 15 feet of the intersection when he slowed down to between "12 and 15 miles an hour, or something like that." His statement was, in effect, that when he first looked to his right across the vacant lot at the southwest corner his view was not obscured by the billboard and he could see appellant's car approaching on York Road at a distance of approximately 800 feet from the intersection; that his vision was then obscured by the billboard until he had reached a point about 15 feet west of the west curb of York Road, when he again looked to his right and saw appellant's car about 300 feet south of the intersection; that he assumed appellant would stop at the sign and therefore continued slowly into the intersection; that when warned by his brother he saw appellant's car was not going to stop at the sign and tried to avoid the accident by turning to the left and had his car at an angle of approximately 45° from a straight line through the intersection when appellant's car "zigzagging" in an apparent attempt to get around the Pontiac came into collision with it. He also testified appellant approached the intersection at a speed of between "50 and 60" miles per hour and that he did not stop at the sign.

Appellant's testimony, in which he was corroborated by two of his guests, was that he was on his way to Doylestown; that as he approached the intersection Anna Panco, sitting beside him on the front seat, had passed candy from a jar to him and to her brother, also

on the front seat, and had turned to pass the jar to the occupants of the rear seat. His direct testimony continued: "Q. Now I want you to tell the court your recollection and your picture of just what happened as you came up to Stenton Avenue and what happened just before you came to Stenton Avenue, and what happened in this case. Tell us everything you can about it. A. As I was going up Old York Road I stopped for a stop and go sign. I was stopped maybe just a few feet from the sign, and when I looked I could not see any car or anything at all. Q. Why? A. On account of the big billboard on the left-hand side, and there is a big billboard on the right-hand side. Q. Go ahead. A. So, the girl was handing some candy out and I started. I started to go and didn't see no car when I started. I put the car in second gear and I was three-quarters past the street when the car hit me and turned me over. I could feel the car going over, and on account of my arm was broken I felt pain in my arm. It threw me out of the car and I was laying on the ground. Q. Had you stopped at that street at the stop sign? A. Yes. Q. When you started up, what gear did you start in, first? A. First. Q. Had you shifted to second when the accident happened? A. I had just started to put it in second when the accident happened."

It is probable that appellant's inability to explain on cross-examination how the diagonal billboard on the lot at the southwest corner obscured his view to the left along Stenton Avenue, when the draft in evidence showed that the corner of the billboard nearest the stop sign was 20 feet west of the west curb of York Road and 46 feet south of the south curb of Stenton Avenue, affected to a considerable degree the conclusion of the trial judge relative to appellant's truthfulness.

Complaint is made in the first and second assignments that Earl A. Pross, an apparently disinterested witness who was walking west along the south side of

Stenton Avenue and had reached a point about a "quarter of a block" east of York Road when the collision occurred, was permitted, over objection, to express the opinion that appellant's car approached and entered into the intersection at a speed of 50 miles an hour. There was a billboard on the lot at the southeast corner similar in size and location to the one on the southwest corner. This board and high weeds on the lot prevented the witness from having a clear view of York Road at all times as he walked toward the intersection. He testified, however, there was a diagonal path through the weeds, running from Stenton Avenue, and behind the billboard, to a point on York Road about half a square south of the intersection; that he looked down this path which gave him a view of York Road for a distance of about 30 feet; that through this opening he saw appellant's car passing north at a speed of 50 miles an hour; that he could not see it again until "it shot out from York Road on across Stenton Avenue." Stress is laid upon the fact that this witness said he had a view of appellant's car through the opening for "probably 15 to 20 seconds," and it is pointed out that this statement cannot be accepted as accurate because a car going 50 miles an hour would travel 30 feet in about one half of a second. It is argued the witness had no real opportunity to form an opinion as to the speed of appellant's car. It must be remembered this trial was without a jury and the record shows the trial judge in overruling the objection said: "Of course, the value of his testimony depends upon how much opportunity he had to observe [the car] and how long he saw it." If this had been the only evidence as to the speed of the Buick car, we are confident the trial judge would not have based his finding of "about 50 miles per hour" upon it. The evidence of this witness must be considered along with all the other evidence upon the point.

In addition to the testimony of Joseph Ronciglione relative to the speed of appellant's car, the trial judge was justified in drawing some inferences from the position of the cars after the accident.

In his opinion he described the Pontiac car as having come to rest "on Stenton Avenue lying on its left side about 20 feet south of the north curb line of Stenton Avenue and about 15 feet east of the east curb line of Old York Road." But the testimony of detective Morris (49a) discloses that this car had been "lifted from its spot on the intersection and pushed east on the north side of Stenton Avenue about 60 feet,......but at the particular spot where the car had been overturned there was a lot of oil and broken glass in the street ......in part of the northbound track on the York Road, but mostly in the cartway at a point a little above the center of Stenton Avenue." This undisputed testimony indicates that the Pontiac car overturned and remained practically at the point of collision.

Other uncontroverted testimony showed that appellant's car turned over "a couple of times" and landed on its right side across the east sidewalk of York Road, with its front in the weeds of the abutting lot, 60 feet north of Stenton Avenue, or approximately 90 feet north of the point of collision. For a case in which our Supreme Court attached considerable importance to the positions of the respective vehicles after the collision, see *Ranck v. Sauder,* 327 Pa. 177, 193 A. 269.

Finally, it is earnestly argued in behalf of appellant that the photographs of the cars taken immediately after the accident corroborate the statement of appellant and his witnesses that the Pontiac car struck his car, head on, about the middle of its left side with such force that the marks of the headlights of the Pontiac car were imprinted upon the left-hand door of appellant's car which had been wrenched from its hinges. The inferences to be drawn from the photographs were also for the trial judge.

When all the evidence is considered we are not convinced that the condition of the car after the accident necessarily discredits the testimony of the driver of the Pontiac car. He testified (79a) that in an effort to avoid the collision he turned his car to the northeast and while on the stand illustrated that at the moment of impact his car was pointed northeast at an angle of about 45°; he also testified appellant was zigzagging his Buick in his efforts to avoid the collision. It seems to us there would be nothing unreasonable about concluding that neither car struck the other head on, or at right angles, but that they came together while each was on its own acute angle from the center line of the avenue, with the result that the front of appellant's car missed the Pontiac, but the middle of its left side struck the right front corner of the Pontiac with such force that the front of the Pontiac was torn off and the left door and rear left side of appellant's car crushed. The angle at which the marks of the Pontiac headlights were imprinted upon the door of the Buick and the fact that appellant's car continued on its course to the north for a distance of 90 feet would both be consistent with an inference that the collision occurred in the manner indicated.

Upon consideration of this record we are of opinion that it contains competent evidence supporting the findings of fact of the trial judge, and that his ultimate conclusion, to the effect that there was present in the evidence those elements of rash and reckless conduct essential to a conviction of involuntary manslaughter, follows from a proper application of the law to the facts.

The judgments and sentences are affirmed, and it is ordered that the appellant appear in the court below at such time as he may there be called and that he be by that court committed until he has complied with the sentences or any part thereof which had not been per-

536

formed at the time the respective appeals in this case were directed by the court below to operate as a supersedeas.