## Commonwealth v. Bartley, Appellant.

Argued November 27, 1962; reargued March 26, 1963. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*A. A. Bluestone,* with him *A. S. Fingold,* for appellant.

*Elmer T. Bolla,* Deputy Attorney General, with him *Walter E. Alessandroni,* Attorney General, for Commonwealth, appellee.

OPINION BY MR. JUSTICE COHEN, June 7, 1963:

This is an appeal from a conviction for speeding under the radar provisions of The Vehicle Code. Since this case calls into question the mechanics of the radar timing system itself, it is necessary to give a brief explanation of the procedure employed by the state police.

The radar set which timed appellant consists of a radar transmitter and receiver placed in the open trunk of an automobile which is parked on the shoulder of the highway. The transmitter emits a cone-shaped beam of radio waves which extends up the lane of on-coming traffic for a distance of 200 to 300 feet. When a vehicle comes into the zone of influence of the radar (i.e., 200 to 300 feet from the unit), the radio waves strike the vehicle and the motion of the vehicle causes the radio waves to return to the receiver at a frequency different from that which was transmitted. The variance is then translated into a reading of miles per hour upon the radar meter. The angle of the instrument is set in such a manner that the beam does not reflect the speed of traffic coming in the opposite direction. This radar set is the standard equipment used by most police agencies throughout the country and is tested for accuracy in accordance with the radar provisions of The Vehicle Code.[1]

On the night in question, Officers Chylak and Rogers manned the radar unit. Officer Chylak sat in the front seat of the car with the meter on his lap and when an on-coming vehicle registered a speed in excess of the legal limit he would notify Officer Rogers, sitting next to him, who would visually follow the path of the on-coming vehicle through the rear window, continuing to follow the vehicle until it passed by them. Officer Chylak would also follow the path of the vehicle through the rear view mirror. Having set up the

---

[1] See note 3, infra.

radar, tested it, and adjusted the angle of its beam, both men were well acquainted with the point on the highway where the instrument first picks up the speed of on-coming vehicles and they therefore were able to select the particular vehicle in a line of vehicles which registered on the meter.

The evidence discloses that on September 17, 1961, at 10:25 p.m., appellant-Bartley was operating a tractor-trailer truck on the Pennsylvania Turnpike in an easterly direction in the right lane of traffic when he was stopped for speeding. At the time in question, appellant was traveling in a line of five vehicles, with a gap existing between each vehicle of about 400 feet. The first three vehicles passed through the beam without registering an unlawful speed, but a vehicle, later identified as appellant's, broke the beam at a speed of 60 miles per hour, 10 miles over the posted 50 miles per hour limit for trucks. After visually following the lights of appellant's vehicle until it passed by their car, Officers Chylak and Rogers then identified the truck by its markings and description which were illuminated by the headlights of the vehicle behind it. The officers then radioed this description to an interceptor car which stopped appellant's truck. When halted appellant made a statement to the officer impliedly admitting that he knew he was exceeding the legal limit. Later at trial he denied making this statement. The lower court found appellant guilty and an appeal to this Court followed.

Appellant raises two major contentions: First, he maintains that section 1002(d) of The Vehicle Code should be construed to require radar measurement of speed for at least one-quarter of a mile; and second, that the state troopers could not identify beyond a reasonable doubt the particular vehicle which registered the 60 miles per hour speed on the radar meter.

. · Turning to the first contention, an examination of the purposes and structure of The Vehicle Code is essential. The Act of April 29, 1959, P. L. 58, §1002, as amended, 75 P.S. §1002, contains subsections (a), (b), (c·), and (d). Subsections (a) through (c) establish maximum legal speeds, graduated according to the type of area and vehicle involved. In other words, these subsections *define* the various types of speeding offenses. Subsection (d), on the other hand, does not define the offense of speeding but, instead, prescribes the *methods* by which a speeding offense must be ascertained and the type of evidence necessary to prove such violation.[2] See *Sheehy Motor Vehicle Operator License Case,* 196 Pa. Superior Ct. 122, 127, 173 A. 2d 752, 754 (1961). These methods are: (1) In residential or commercial areas, by a measured stretch of not less than one-eighth of a mile, manned by peace offi-

---

[2] "(d)(1) When the rate of speed of any vehicle is timed on any highway within a business or residence district, where official speed limit signs are erected, as provided in this section, for the purpose of ascertaining whether or not the operator of such vehicle is violating a speed provision of this act, such time may be taken by not less than two (2) peace officers, one of whom shall have been stationed at each end of a measured stretch, and no conviction shall be had upon the unsupported evidence of one (1) peace officer, except as hereinafter provided, and no such measured stretch shall be less than one-eighth (1/8) of a mile in length or, under any conditions, the rate of speed may be timed, for a distance of not less than one-quarter (1/4) · mile, by a peace officer using a motor vehicle equipped with a speedometer tested for accuracy within a period of thirty (30) days prior to the alleged violation. An official certificate from an official speedometer testing station, showing such test was made, that the speedometer was adjusted for accuracy, if necessary, the date thereof, and the degree of accuracy of such speedometer, shall be competent and prima facie evidence of the fact that such certificate was issued by an official speedometer testing station appointed by the secretary, and of the accuracy of the speedometer, in every proceeding where an information is brought charging a violation of this section." Act of April 29, 1959, P. L. 58, §1002, as amended, 75 P.S. 1002(d)(1).

cers at each end of the stretch; or (2) under any conditions by a peace officer following a vehicle and timing it on his speedometer for a distance of not less than one-quarter of a mile. Subsection (d) was amended by the Act of April 28, 1961, P. L. 108, §2, 75 P.S. §1002(d.1)(1) (1962 Supp.), which authorizes the use of radiomicrowave equipment in timing speed.[3]

Appellant takes the position that since the radar amendment is silent as to required distances of measurement, the legislature intended to incorporate in the amendment the minimum distances contained in the part of subsection (d) set forth above. We do not agree. An examination of the entire statutory scheme indicates that measurement by radar is merely another method by which speeding violations may be ascertained and proved, and this method is separate and apart from the other two types of measurement. Indeed, it would be a tortured construction to read the aforementioned minimum distances into the amendment. In the area where appellant's truck was stopped for speeding, before the radar amendment the Act of 1959 would have required that his speed "be timed for a distance of not less than one-quarter (¼) mile, by

---

[3] This section reads in pertinent part as follows:

"(d.1)(1) The rate of speed of any vehicle may be timed on any State highway, including the Pennsylvania Turnpike System, by officers of the Pennsylvania State Police through the use of radiomicrowaves, commonly referred to as electronic speed meters or radar.

"No conviction shall be had upon evidence obtained through the use of radar apparatus unless—(i) it is of a type approved by the secretary, and (ii) it has been calibrated and tested for accuracy and found accurate or adjusted for accuracy within a period of thirty days prior to the alleged violation, and (iii) official warning signs have been erected on the highway by the proper authority indicating that radar is in operation, and (iv) the speed recorded is six or more miles per hour in excess of the legal speed limit."

a peace officer using a speedometer." Since the legislature is presumed not to intend an impossible and unreasonable result, this requirement cannot be read into the radar amendment because it would be impossible for a car equipped with radar to follow a vehicle for one-quarter of a mile. See Statutory Construction Act of May 28, 1937, P. L. 1019, Art. IV, §52(1), 46 P.S. §552. Additionally, the one-quarter of a mile requirement is limited by its words to the method of speedometer measurement.

However, in support of appellant's position it is argued that military radar is capable of measuring speeds of objects over the one-quarter of a mile distance, and that it is the type of equipment that the legislature contemplated. Apart from the difficulty of reading the speedometer provision into the radar amendment, the conditions existing at the time of the amendment militate against the construction suggested by appellant. Since Pennsylvania was one of the last states to adopt radar, and since these other states used the same so-called "instantaneous timing" type of radar used by the officers in the present case, the legislature, in the absence of any evidence to the contrary, must be presumed to have intended the use of this standard type of radar.

Moving to the factual issue of the identification of appellant as the violator, the trial judge had determined the credibility of the witnesses and hence his findings are as binding upon us as the verdict of a jury, if supported by competent evidence. See *Commonwealth v. Matteo*, 130 Pa. Superior Ct. 524, 528, 197 Atl. 787, 789 (1938).

Appellant's argument on the issue of identification has two aspects. The first is concerned with alleged defects in the process of radar timing itself which may have caused the speed of a vehicle other than that of appellant's to register on the radar meter. The sec-

ond questions the perception of Officers Chylak and Rogers.

As to the radar process, appellant maintains that the path of the radar beam overlapped into the lane of traffic going in the opposite direction, thereby leaving open the possibility that the speed of a westbound vehicle and not appellant's vehicle registered on the meter. Appellant also contends that other vehicles were passing his truck at the time of the speeding occurrence, thereby raising doubt as to which vehicle's speed registered on the meter. Both of these possibilities were clearly refuted by positive Commonwealth evidence. Under the standard of review set forth above we are required to affirm the findings of the trial judge who saw all the witnesses and heard all the testimony.

Likewise, as to the visual perception of the identifying officers, there is sufficient testimony and evidence, if believed, to satisfy the Commonwealth's burden of proving beyond a reasonable doubt the identity of appellant's vehicle. After identifying on direct examination appellant's vehicle as the one which exceeded the speed limit, Officer Chylak was cross-examined as follows by appellee's counsel: "Q. Now, Officer, isn't it a fact that you are testifying solely from the meter reading and not from the fact that you actually saw this vehicle? A. I observed the vehicle coming up behind me. Q. But you observed many vehicles coming up behind you, isn't that right? A. That is correct sir. Q. And when it registered, when the meter registered sixty miles an hour, you identified it by seeing the name on it? A. After it had proceeded past my car, yes, sir. Q. Now, officer, in all fairness, you weren't certain which one of these five vehicles, those five trucks, was the one actually going sixty miles an hour? A. If I hadn't been certain, I wouldn't be here sir. Q. In your mind you were certain? A. Yes, sir."

The identification by Officer Chylak was corrobo-

rated by Officer Rogers who testified on direct examination as follows: "Q. Can you recall or do you recall a particular tractor-trailer coming into the radar beam and registering sixty miles per hour? A. Yes, I do. This particular vehicle he was speaking about as I remember it there was a little more of a distance between the last two vehicles. . . . Q. When were you able to identify this particular vehicle? A. Pardon? Q. You watched it to make sure it was the same? A. Yes, I did. . . . Q. Officer, can you recall just as Corporal Chylak reported a tractor-trailer going sixty miles an hour how many cars were in the rear, how many trucks or how many vehicles? A. Just two of them. Q. And how far was the Kramer tractor-trailer from the other vehicle as you recall? A. Well, its pretty hard to say, but I would roughly say two to three hundred feet. Q. Was it possible that you got the two mixed up? A. It's not."

The identification by Officer Chylak, corroborated by Officer Rogers, even without the implied admission by appellant that he was exceeding the speed limit, was sufficient evidence to convince the trial judge beyond a reasonable doubt that appellant's vehicle was the one which registered 60 miles per hour on the radar meter.

Judgment affirmed.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

Although I join the Court in its affirmance of the court below, I do so because here the evidence is clear and convincing, establishes a positive identification of the vehicle and its speed, and satisfies the Commonwealth's burden of proof beyond a reasonable doubt. Nevertheless, the instantaneous electronic timing device employed prompts me to make an additional cautionary observation.

The nature of radar detection and its highway use suggests that evidence which is less clear, definite and certain is not an acceptable basis for conviction. Since the radar device instantaneously locks in the speed at the precise moment the officer detects that a vehicle is traveling over the speed limit (plus tolerance permitted), basic justice requires that evidence of alleged violation be carefully scrutinized in light of the limited capability of the radar device itself and all circumstances attending its use.

Prior to the radar provisions, there were two methods of detecting speed violations: (1) by clocking over a one-eighth mile measured stretch and (2) by a tested speedometer measuring the travel over a distance of one-quarter mile. The radar amendment to The Vehicle Code provided the third method to measure speed of a moving vehicle—by an instantaneous detecting device—and permitted conviction upon the results of such measurement. Thus, a motorist whose speed is measured by the first two methods may exceed the speed limit temporarily without fear of arrest and conviction if under the first method he slows his vehicle before traveling the full one-eighth mile, or under the second method he slows his vehicle before traveling the full one-quarter mile. However, under the radar provisions, this temporary or momentary excess speed would not preclude prosecution because the speed of the vehicle is locked in at the instant the vehicle exceeds the speed limit.[1] It is apparent, therefore, that the difference in the methods of measuring speed may deprive a defendant apprehended by radar of the equal protection of the law and may afford an immunity to other

---

[1] For example, three motorists, each on a separate highway, and each subjected to one of the three methods of detecting speed, could *momentarily* all be doing the same excessive rate of speed, but only the motorist detected by radar would be subjected to prosecution.

operators under the measured stretch requirements which he does not possess.

It would appear that the purpose of the measured stretch requirements, in addition to affording a reasonable basis for calculating speed, is also to allow for a momentary excess due to emergencies, the passing of other vehicles or even for momentary or inadvertent lapses on the part of operators who have no intention of violating the law. Surely, the Legislature did not intend by the radar amendments the unfair result of conferring immunity on a momentary violator in the one-eighth or one-quarter mile instances to the exclusion of the radar violator whose offense may also be momentary.

The caution is obvious; the radar device must be carefully and fairly used within the sphere of its acknowledged capacity in order to avoid the challenge of lack of uniformity or other improper uses. Only in this way may it be a legally acceptable instrumentality in the search for increased highway safety.

Mr. Chief Justice BELL joins in this opinion.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

If there is one proposition in American law which is more firmly established than any other, one which is regarded almost with reverence since it involves the most precious possession of any citizen—his liberty and his good name—it is that no person may be convicted of crime unless the evidence establishes his guilt beyond a reasonable doubt. Reasonable doubt has been defined in a hundred different manners. One statement sums it up as follows: "Reasonable doubt is neither excessively timid nor excessively bold. It is not to be gauged by the actions of the man who would hesitate to cross a bridge resting on concrete piers and sus-

pended by indestructible steel; nor by the actions of the man who would cross a bridge against fifty angels warning him that the piers had crumbled and the spans had fallen. Reasonable doubt is the doubt of a reasonable man. When the reason, like a bird flying over the sea, looks in vain for a substantial object on which to rest and fold its wings of perplexity, it can be said that the mind is in a state of reasonable doubt." *Commonwealth v. Clinton*, 391 Pa. 212, 219.

I cannot read the record in this case and say that the doubt which the evidence produces ever found a solid rock upon which to rest, assured that justice had been done and that the accused was convicted in accordance with the standards of American proof, engraved in the bronze of undeviating fairness and propriety.

This case involves the use of radar on the highway to record the speed of passing automobiles. No one can possibly laud the purpose of traffic radar more than I. To the extent that it reduces the appalling carnage occurring on the highways of the nation every day, by removing from the thoroughfares the reckless speeder, it is more than worth its weight in the gold of the lives it saves. Where the radar instrument is one that has been scientifically tested and proved to be mechanically reliable, and where it is scientifically applied so as to record the speed of a single automobile, there can be no question that the meter reading is a dependable one, and the conviction of the accused person, if the meter shows that the car was exceeding the speed limit, is not only warranted and justified, but imperative.

There can be no question also that the mere fact that motorists know that the radar's eye is on them and that, like an unerring bloodhound, it will catch those who violate the speeding laws, serves to hold elevated the toe which might otherwise press the ac-

celerator down to breakneck speed and possible body-crushing collision. All that must be taken for granted. Where a single automobile moves through the radar beam, the speed which is registered on the dial can only refer to one automobile because there is only one recording, and the officer manipulating the instrument sees who it is that is producing the recording.

In the case before us, however, there were five motor vehicles within the radar beam. Which one offended against the speed laws of the Commonwealth? Which one caused the radar needle to register 60 miles per hour? The Commonwealth says that it was the vehicle being driven by the defendant W. L. Bartley. The defendant denies he was the guilty driver.

We must understand that the radar instrument here under discussion does not, unlike military radar, show moving objects. It produces only one instantaneous, lightning flash result, a figure which speaks of miles per hour. In the field of identification the instrument is deaf, dumb and blind. Identification must be left to a human being and where a human being stands, there stands inevitably at his side, the possibility of human error. That possibility is minimal where only one car is involved, but where two cars enter into the pattern of moving events, doubt raises its disturbing head.

Robert L. Bomboy, testifying for the Commonwealth as an expert in the use of radar, was asked by defendant's counsel: "If they [the police officers] are observing the car in the lane, that's in the right lane because it's the first one to hit the beam and after the two cars go through, frankly, *they don't know which one has exceeded the speed limit, do they?*" (Emphasis supplied)

The expert replied: "That's right. . . ."

Bomboy also testified that where there are two vehicles within the registering beam the radar picks up

"the largest moving object." But when he was asked if it always picked up the "largest object," he replied: "Not necessarily." The following then occurred: "Q. I don't understand that. A. All right, sir. Q. Wherein is the difference? What do you mean by a better reflection? A. By the quantity of energy received by the radar from the moving target. Q. Wouldn't you get a better reading on a larger target than a smaller one? A. Not if the car were going at a high rate of speed because when the car goes at a high rate of speed the Doppler frequency is higher and the present emphasis networks in the radar takes over."

All this, of course, raises a doubt of its own.

Defense counsel put more questions concerning two moving vehicles and then asked which one would register on the meter. The expert replied: "The car going at the highest rate of speed provided you get the best target return from it." Does not the proviso here—"provided you get the best target return from it"—eat up the main premise? Who and what determines what is the best target return?

It appears that size, speed and proximity are all vital factors in determining which vehicle is being clocked as to speed, but it has not been expertly decided which factor dominates over the other two when they vie for appearance on the dial. It is said that if two cars are at the moment of recording running abreast, the nearer one to the radar instrument will register even though the one farther away is actually traveling at a higher rate of speed.

But the doubt which is generated when only two cars are involved becomes a complete rout, so far as technical accuracy is concerned, when three, four or five vehicles are within the radar beam simultaneously.

Up until this time we have said nothing about visibility, but it must now be stated that the recording in this case was made at night in total darkness. There

were two police officers in the radar car, Chylak, who held the radar meter, and Rogers, who looked out into the road. Since more than one vehicle was on the highway at this point, as I have already stated, how did Rogers know which car it was that his partner noted in the radar dial as traveling 60 miles per hour? Rogers explained at the trial that he knew the exact spot where Chylak clicked the speed and that he saw the defendant's car at that spot. It was an intriguing theory, but under cross-examination it was less than convincing: "Q. You said it was the first vehicle? A. You might say I knew because we have *almost a given spot* where the radar picks the vehicle up and you can just tell when the vehicle hits that given spot. . . . Q. I don't follow you. This is midnight. This is late at night. It is pitch dark without headlights on these cars? A. Yes, sir. Q. You tell me how you can identify or point to a specific spot on this road anywhere along there and say positively that at that point a vehicle crosses? A. Well, if you direct your eyes back at one given place long enough, you can more or less tell it is a given spot. Q. That's the way you did it? A. That's the way I did it." (Emphasis supplied)

To say that one can pick out an exact spot in Stygian darkness and tell which car, out of a number of cars, passed that spot at a given instant, tips the scales of incredulity to the point where reasonable doubt dominates the entire face of acceptable evidence. Moreover, Rogers' evidence was based on an assumption, which in itself is the antithesis of certainty. He was asked: "You just assume he said—when he said, 'Sixty.' You assume the first car was the car that went through that beam?" He replied: "That's right, sir."

I respectfully assert that this Court is doing the cause of effective radar surveillance a disservice by affirming a conviction which is founded in darkness, immersed in doubt, and wrapped in assumptions.

What should be done is to build faith in radar where it is properly applied because, as I have said, it aims at saving human life. But it must not be used as an engine for trapping innocent motorists. I do not doubt that in time the radar system of checking automobile speed will develop to the point that even with multiple cars in the scene, the instrument will perfectly point out the motorist offender. It has not yet reached *that* stage of perfection and its meritorious record, to the extent of its capabilities, should not be marred by attributing to its mechanical virtues which it does not possess, thereby weakening the faith of the motoring public in its efficacy generally.

For these reasons I dissent.