## Bentman, Appellant, v. Seventh Ward Democratic Executive Committee.

Argued November 19, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Henry W. Sawyer, III,* with him *Drinker, Biddle & Reath,* for appellants.

*Isadore A. Shrager,* for appellees.

OPINION BY MR. JUSTICE JONES, March 22, 1966:

On April 28, 1964—at a primary election—Donald W. Cox and Hedvah Shuchman were duly elected by a majority of the Democratic voters of the 6th and the

10th Divisions, respectively, of the 7th Ward of Philadelphia as Democratic party committeemen from such districts. Their election was certified by the official election board and they were seated, without question, as members of the 7th Ward Democratic Executive Committee (Executive Committee).

On August 10, 1964, Cox and Shuchman were notified, in writing, that a meeting of the Executive Committee would be held on August 12, 1964, to consider and vote upon their removal as party committeemen. At that meeting, Harry Melton, then Democratic leader of the 7th Ward, charged Cox and Shuchman with having failed to act in harmony with the Executive Committee.[1] The Executive Committee, allegedly by a 17-5 vote, voted to remove Cox and Shuchman as party committeemen. They were then removed from office and Melton appointed others to fill the vacancies on the Executive Committee.

Joined by two Democratic party electors who had voted for them at the primary election, Cox and Shuchman instituted a mandamus action[2] against the Executive Committee, Melton, the ward leader, and Francis R. Smith, Chairman of the Democratic County-City Committee. In this action, inter alia, it was averred:

---

[1] Allegedly, Cox and Shuchman had supported and worked for the nomination of a candidate for the Democratic nomination for the United States Senate who had not been endorsed by the Democratic organization of Philadelphia. *The alleged disloyalty took place at a time when Cox and Shuchman were not party committeemen.*

[2] Mandamus, not quo warranto, was the appropriate action. In mandamus, the chief issue is the propriety of the removal from office; in quo warranto the chief issue is the right or title of one person or another to the office, not the propriety of the removal. See: 11 Standard Pennsylvania Practice ch. 47, §5, pp. 331, 332: *Salopek v. Alberts*, 417 Pa. 592, 209 A. 2d 295; *Hunter v. Jones*, 417 Pa. 372, 207 A. 2d 784; *Bobick v. Fitzgerald*, 416 Pa. 588, 207 A. 2d 878.

(a) that Cox and Shuchman received no notice of the charges against them, although such notice had been regularly requested prior to the meeting; (b) that the charges did not constitute grounds for their removal from office; (c) that, after the action of the Executive Committee had taken place, a request was made to Smith concerning the manner and procedure to be followed in appealing from the action of the Executive Committee but such request was ignored; (d) that their removal was without cause and due process and in violation of the constitutional rights of Cox and Shuchman; (e) that Cox and Shuchman have been denied their right and privilege of taking part in party functions as regularly elected party committeemen.[3] The appellees filed preliminary objections which averred: (a) an improper joinder of parties defendant; (b) lack of jurisdiction because mandamus does not lie to interfere with actions of a political party or its internal organization; (c) laches; (d) a failure to allege a want of adequate legal remedy. The Court of Common Pleas No. 2 of Philadelphia County sustained the preliminary objections *solely* upon the jurisdictional ground that courts will not interfere with the actions and internal organization of a political party. From that order the present appeal was taken.

On the theory that well pleaded facts in this complaint must be accepted as true in testing the validity of preliminary objections to such complaint, we accept the following facts: (a) both Cox and Shuchman were regularly elected as party committeemen from their respective districts and, for a four-month period subsequent to the election, recognition was given by the Executive Committee to their election and right to sit on such Committee; (b) the notice given them of the

---

[3] In the posture of this litigation, we accept as facts only such facts—not conclusions—as are well pleaded in the complaint.

meeting contained no statement of the charges against them nor were they so informed until the meeting; (c) the charges made of their disloyalty concerned actions which took place prior to their election as party committeemen and not during their tenure of office; (d) they were removed from office and their successors appointed; (e) that an appropriate request for information concerning the appeal procedure within the organization structure was not granted; (f) they have been refused the right to perform the duties of party committeemen.

Appellants' counsel concede that, prior to 1947, under our case law the courts in this Commonwealth would not entertain, either in law or equity, the instant type of litigation. See: *Commonwealth ex rel. Koontz v. Dunkle,* 355 Pa. 493, 50 A. 2d 496. In *Koontz,* this Court, in a per curiam opinion, affirmed an order of the court below which denied the issuance of a writ of quo warranto to test the right to the office of a county chairman of a political party; its rationale was that officers of a political party are private, not public, officers and it affirmed the principle stated in *Kearns v. Howley,* 188 Pa. 116, 122, 41 A. 273, that: "Political parties . . . must govern themselves by party law. The courts cannot step in to compose party wrangles, or to settle factional strife." It is appellants' position that, by reason of changes in the statutory law and the impact of recent federal case law, the law in this area has now been changed.

Six months subsequent to the decision in *Koontz,*— on June 14, 1947,—the legislature *added* a new section to the Election Code[4] which provides: "Section 812. District Committees. Whenever two or more members

---

[4] Election Code of June 3, 1937, P. L. 1333, §101 et seq., 25 P.S. §2601 et seq., as added to by Act of June 14, 1947, P. L. 610, §1, 25 P.S. §2842.

of a political party shall be elected or appointed, as the rules of the party may provide, as members of a political committee to represent the members of such party in the respective election districts, such members shall constitute a political committee of said political party to function within such election district: Provided, that, When acting in the capacity of a political committee, such duly elected or appointed members shall be subject to the control, direction and supervision of the political committee of which they are members." It is argued, by reason of this addition to the Election Code, considered in conjunction with the time of its passage with reference to *Koontz*, that it was the intent of the legislature to confer upon political or party committeemen such legal status as to make them amenable to the jurisdiction of the courts.[5]

The Act of 1947, supra, provides for but *one* addition to the Election Code. According to its title, the purpose of that addition is to provide that "where members of a political party are appointed or elected to represent the members of such party in an election district, said members shall constitute a political committee for such district, subject to the control of the respective political committee of which they are members." By such addition, it is evident the legislature recognized a status in law in party committees and committeemen.

Sixteen years prior to the passage of this statute, this Court was confronted with a controversy almost identical with that in the case at bar: *Kenneck v. Pennock*, 305 Pa. 288, 157 A. 613. In *Kenneck*, the appellants had been elected, at a primary election, to mem-

---

[5] In *Koontz*, reliance was placed upon *Kearns*, supra, wherein this Court refused to intervene on behalf of a county committee because of the absence of a property interest in the membership of a county committee and upon whom the Court noted "the right to be a member is not conferred by any statute." (188 Pa. at p. 121).

bership on the 34th Ward Executive Committee of the Republican Party in Philadelphia; several months thereafter, the appellees, officials of the Ward Committee, excluded the appellants from membership on the Ward Committee, declared their seats vacant and appointed successors to them. In a per curiam opinion, this Court, on the opinion of the lower court, held that the appellants were party, not public, officers who were amenable to their party alone and lacking in any property right in their membership on the Ward Committee and, in reliance on *Kearns*, supra, refused equitable intervention in the controversy.[6]

Not only in the 1947 addition but in other of its provisions the Election Code recognized the office of committeemen of a political party. Inter alia, the Code provides: (a) the *manner of election* of party committeemen at primary elections by "party electors" (Election Code, supra, §902, as amended by the Act of May 23, 1949, P. L. 1656, §6, 25 P.S. §2862); (b) that party committeemen who receive a plurality of the votes of the "party electors" at a primary election shall be the "party officers" of their respective parties (Election Code, supra, §810, 25 P.S. §2840); (c) that notice of the list of all party offices to be filled at a primary election must be given by the County and/or City chairman (Election Code, supra, §904, as amended, Act of January 14, 1951, P. L. (1952) 1937, §2, as amended by the Act of August 13, 1963, P. L. 707, §9, 25 P.S. §2864). It is clear beyond question that certain party offices, including that of party committee, are now filled through the same electoral process and under state statutory authority as public offices, except that voting for party offices is restricted to qualified electors of the party.

---

[6] If the present appellants are correct, then *Kearns, Kenneck* and *Koontz* can no longer be considered authoritative.

Two questions naturally arise: (1) what was the legislative intent in setting up the electoral machinery for the selection of party committeemen? (2) to what extent, if at all, will courts take jurisdiction to carry out and enforce the legislative intent?

The instant controversy, intra-party in nature, presents a basic and fundamental issue in the democratic process and government by representation:[7] whether the electors of a political party have a right, cognizable in a court of law, to choose whom they will to represent them in their party's organization and councils? Cox and Shuchman, availing themselves of the electoral machinery provided by law for such purpose, received a plurality of the votes cast by members of their own party, in their respective districts, for the party offices of party committeemen to represent such party electors in the party organization and, specifically, in the Executive Committee; the Executive Committee removed them and refused to accord recognition to them as the chosen representatives of the majority of the party electorate in their districts. In the posture in which this controversy now reaches us, Cox and Shuchman were removed not for anything which they had done as committeemen or in their representative capacity but by reason of that which it is alleged they

---

[7] Sir Thomas Smith, describing the theory of Parliament as a representative body, in his book DE REPUBLICA ANGLORUM (1583) wrote: "For every Englishman is intended to be there [in Parliament] present, either in person or by procuration and attorneys, of whatever preeminence, state, dignity or quality soever he be, from the prince, be he King or Queen, to the lowest person of England. And the consent of Parliament is taken to be every man's consent." Book II, ch. 1. During the formation of the U. S. Constitution, William Paterson said at Philadelphia: "What is the principle of representation? It is an expedient by which an assembly of certain individuals chosen by the people is substituted in place of the inconvenient meeting of the people themselves.": Farrand, Records of the Federal Convention I, p. 561.

had done prior to their election and selection. The Executive Committee, by its action, has ignored the fact that these two persons by a majority of the party electorate were chosen to represent them, has rendered the electoral process a nullity and a farce, has denied the majority of the party electors the right to be represented by persons of their choice in the party councils and now urge that the courts, because a political party is a private and not a public entity, are powerless to intervene.

The reluctance of courts in the past to interfere in and to entertain litigation dealing with the internal organization or management of any private entity and the philosophy underlying *Kearns, Kenneck* and *Koontz* is understandable. Today, however, the relationship between political parties, the government and the public has become such that, in many areas, the public interest is not only *directly* affected by political parties but such parties actually perform *public* functions imposed upon them by law. Insofar as a political party performs statutorily-imposed public functions and to the extent that its actions constitute state action, the internal organization of such political party is a matter of such concern to the public as to make it subject to constitutional limitations and judicial restraint. When the internal organization of a political party directly affects its performance of such public function then not only *may* the judiciary intervene but it *must* intervene.

In our Commonwealth, the legislature has seen fit to impose upon political party organizations the performance of certain public functions which directly affect the public and our government. Such fact, considered in connection with the extension in recent years of the concept of "state action" under the 14th Amendment, has brought about a change of judicial thinking in this area of the law. Judicial interference, even

with the internal organization of a political party, is justifiable if such internal organization may directly affect the performance of a public function and the public interest. The invocation of judicial interference in this area must be restricted or circumscribed; judicial intervention must be limited to controversies where the issue raised bears a *direct* and *substantial* relationship to the performance of *public* functions by the political party.

The statutory addition to the Election Code effective in 1947 clearly gave recognition to the legal status of party committeemen and political committees the lack of which up to that time had been questioned by our courts. However, appellees submit that, under the wording of the statute and even assuming the recognition of the legal status of party committeemen, the Executive Committee is expressly given the "control, direction and supervision" of the party committeemen and that such "control, direction and supervision" embraces a right of the Executive Committee to remove committeemen from office and to appoint others in their stead.

In the construction of this statute, we bear in mind two rules of construction: (1) the presumption that the legislature does not intend a result which is absurd or unreasonable (Statutory Construction Act of 1937, May 28, P. L. 1019, §52(1), 46 P.S. §552; *Commonwealth v. Bartley*, 411 Pa. 286, 191 A. 2d 673) ; (2) the presumption that the legislature did not intend to violate the Constitution of the United States or of this Commonwealth (Statutory Construction Act, supra, §52(3) ; *Commonwealth v. McCoy*, 405 Pa. 23, 172 A. 2d 795.)

If we construe the language of the 1947 statute— "control, direction and supervision"—to mean that the Executive Committee thereby is given the authority to refuse recognition to the choice of the party electors

in the selection of party committeemen and to refuse to allow them to act as party committeemen then we reach a result patently absurd and unreasonable. Moreover, mindful that the legislature has provided that there shall be a certification of what party officers are to be elected at a primary election by the chairman, that party electors are expressly given the right to select their representatives on the political committee at an election paid for out of the public treasury and conducted under official government auspices and that only such party committeemen shall be deemed elected who shall have received a plurality of the votes cast in a district by party electors, then, if after all this legislatively provided procedure, the Executive Committee of the ward is to have the right, under the guise of "control, direction and supervision" of the party committeemen, to nullify and ignore, without legal cause, the results of such election and selection of party committeemen, we reach a result patently absurd and unreasonable. A review of the legislation governing the manner of election of party committeemen clearly refutes such reading of the words "control, direction and supervision" and makes evident that the aim of this legislation was identical with that which the Court of Appeals of New York in *People ex rel. Coffey v. Democratic General Committee,* 164 N.Y. 335, 341-2, 58 N.E. 124, 126, attributed as the purpose of a New York statute: "The dominant idea pervading the entire statute is the absolute assurance to the citizen that his wish as to the conduct of the affairs of his party may be expressed through his ballot, and thus given effect, whether it be in accord with the wishes of the leaders of his party or not, and that thus shall be put in effective operation, in the primaries, the underlying principle of democracy, which makes the will of an unfettered majority controlling. In other words, the scheme is to permit the voters to construct the organization from the bottom upwards, instead of per-

mitting leaders to construct it from the top down-wards."

By the same token, we must construe, if possible, the statutory law concerning the selection and removal of party committeemen in such manner as not to violate the concept of "due process" embodied in the Constitution of the United States.

Under the Election Code and other legislation the party machinery of a political organization is mandated to perform functions which are definitely *public* in character. By way of *illustration*: if a vacancy happens after a primary election in any party nomination, by reason of the death or withdrawal of the candidate, the committee of the party organization fills such vacancy by a substituted nomination (Election Code, supra, §979, as amended, 25 P.S. §2939); in the event of a special election to fill a vacancy in either the Congress or the General Assembly, a committee, caucus, or convention of the party is entitled to select the nominee of the party (Election Code, supra, §630, as amended, 25 P.S. §2780); in special emergencies, the party county chairman must be consulted before an appointment is made to fill existing vacancies in the legislature (Act of October 23, 1959, P. L. 1365, §7, 46 P.S. §145.7) and the judiciary (Act of October 23, 1959, P. L. 1369, §8, 71 P.S. §779.8). Appellants, quite properly, point out in their briefs a striking example of *direct* action by a political party in a public function in the case of the additional judgeships created in Philadelphia County by the legislature in 1964. Since these additional judgeships were created too late to be included in the voting at the primary election, under the statutory law,[8] the nomination of candidates for such judgeships was made by the several political par-

---

[8] Election Code, supra, §993, added 1953, August 26, P. L. 1479, §1, 25 P.S. §2953.

ties in accordance with their party rules. The Democratic County Chairman and the Democratic County Committee named the candidates of that party for these additional judgeships. As appellants stated: "[Cox and Shuchman] [had] a right to participate in and cast their votes for the individuals comprising that committee [Democratic County Committee], and the plaintiff voters [Bentman and Evers] [had] a constitutional right to participate in that process in the same sense, i.e., by having the divisional committeemen [Cox and Shuchman] for whom they voted vote for the persons who [were] to make the selection of high public officials." Appellants might well have argued the converse, i.e., that two persons who had not been chosen by the party electors but by the ward leader were given the right to vote and participate in the selection of high public officials. The Supreme Court of the United States in *Smith v. Allwright,* 321 U.S. 649, 64 S. Ct. 757, holding that the selection of party nominees for a general election is state action subject to constitutional restraint, stated: "We think that this statutory system for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election. *The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party.*" 321 U.S. at 663, 64 S. Ct. at 765). (Emphasis supplied).

In Georgia, the legislature had given to certain dental associations the right to submit names for appointment by the Governor as members of three state agencies; these dental associations excluded negroes from their membership. In *Bell v. Georgia Dental Association,* 231 F. Supp. 299, the court held that, since

the dental associations, otherwise entirely private in character, were given by the legislature the right of nomination of members to the state agencies, *to that extent* such associations were agencies of the state and engaged in state action and the exclusion of negroes from membership in these associations and their consequent deprivation from a right to participate in such state action constituted a violation of the U. S. Constitution. In *Bell,* a minority group was denied the right to vote in the selection of nominees for appointment to state office; in the case at bar, a majority group's representatives, chosen in accordance with law, were removed without legal cause and by such action the majority group was excluded from participation in the selection of nominees for public office.

In *Rice v. Elmore,* 165 F. 2d 387, cert. den. 333 U.S. 875 (C.A. 4), the court, speaking through Judge PARKER, stated: "The fundamental error in defendant's position consists in the premise that a political party is a mere private aggregation of individuals, like a country club, and that the primary is a mere piece of party machinery. The party may, indeed, have been a mere private aggregation of individuals in the early days of the Republic, but with the passage of the years, political parties have become in effect state institutions, governmental agencies through which sovereign power is exercised by the people." (165 F. 2d at p. 389) and, further: "When these [party] officials participate in what is a part of the state's election machinery, they are election officers of the state de facto if not de jure, and as such must observe the limitations of the Constitution. Having undertaken to perform an important function relating to the exercise of sovereignty by the people, they may not violate the fundamental principles laid down by the Constitution for its exercise." (165 F. 2d at p. 391).

Reliance is placed by appellees upon *Lynch v. Torquato*, 343 F. 2d 370 (C.A. 3). *Lynch* held that "the citizen's constitutional right to equality as an elector . . . applies to the choice of those who shall be his elected representatives in the conduct of government, not in the internal management of a political party." *Lynch* was dealing with a complaint based upon an alleged disparity of party registration among the several precincts in a county with the alleged result that the county chairman was elected by committeemen whose base of selection violated the "one man one vote" rule. Our examination of *Lynch* finds no suggestion that it determines the issue which presently confronts us.

Inasmuch as the legislature has seen fit to impose on political party organization certain duties which bear a *direct* and *substantial* relationship to the selection of public officials by the electoral process[9] the *complete* privacy in nature of party organization recognized by our courts in the past no longer exists. The assumption of such obligations by party organizations has marked the entry by such party organizations into an area of public activity which renders their activities in such area amenable to judicial supervision. When the activity of a party organization in such area or when its internal organization and membership has a direct bearing on its activity in such area is challenged as constitutionally offensive and it is claimed that, in the performance of its statutorily imposed duties amounting to state action, the party organization violates the concept of due process, then the judiciary not only *may* but must intervene.

The challenge in this action is to the right of a party committee to refuse recognition of membership on such committee to persons who have been lawfully

---

[9] Such as the selection, in certain instances, by party committees of party nominees for public office,

elected to such membership by a majority of the qualified party electors. Membership on such committee, a status now legally recognized is an important right and privilege not only to the person elected but also to the voters who elected such person to act as their representative on the committee. Membership on that committee carries with it the right to participate in selection of the political body which, under the legislative direction, in certain instances, selects the party nominees for public office, an activity clearly constituting state action under the 14th Amendment. Deprivation of such membership and the concomitant right of participation in the selection of public officers bears such a *direct* and *substantial* relationship to the electoral process as to be a matter of judicial concern; only by the intervention of the courts can the constitutional limitations on the exercise of state action be safeguarded.

To the extent that the instant action of the Executive Committee bears a relationship to the state action inherent in the selection of party nominees for public offices, such action may be tested in the judicial area to determine whether the action of the Executive Committee denying membership on the committee to the chosen representatives of the party electorate offends against the constitutional provision mandating due process in state action.

The court below erred in finding a lack of jurisdiction under the pleaded circumstances.

Lastly, appellees urge that, since the institution of this litigation, a ward realignment—effective December 1, 1965—has taken place in Philadelphia as the result of which Cox and Shuchman are no longer residents of the 7th Ward. Appellees, therefore, contend this matter is moot. In their supplemental brief and record, appellees have directed our attention to a map showing the ward realignments in the areas in ques-

tion. A study of that map reveals that neither of the districts in which Cox and Shuchman were elected have been divided: they remain intact as election districts. Under the circumstances, we do not consider the matter as moot.

Order vacated and the matter remanded to the court below for further action consonant with the views expressed in this opinion. Appellees pay costs.

DISSENTING OPINION BY MR. JUSTICE COHEN:

The majority opinion has held that our courts have jurisdiction to issue a writ of mandamus compelling the reinstatement of an ousted committeeman of a political party despite the fact that no vacancy in that position exists. In so holding, the majority have overlooked one crucial fact—that before the outsiders can get in, the insiders must be ordered out. And this, I am afraid, no court should ever accomplish by writ of mandamus. Indeed, plaintiffs themselves have averred that following their removal from office, two successors were appointed. It is obvious then that what plaintiffs seek is to test the right of their successors to the offices. In Pennsylvania it is time-honored that where a determination as to right or title to public office is sought the exclusive remedy is quo warranto. 11 Standard Pennsylvania Practice 334. Mandamus will not lie to try title to an office in which there is already an incumbent. *Commonwealth ex rel. Davis v. Blume,* 307 Pa. 406, 161 Atl. 551 (1932). In *Davis,* Mr. Justice MAXEY declared: "Relator is attempting to secure the ouster of defendant from the office of which, appellee says, the latter is now the de facto incumbent, with a view thereafter, if he is successful in this proceeding, of securing his own reinstatement. The remedy directed to this end is plainly the one employed, quo warranto, in order to determine the validity of defendant's

claim to be entitled to collect the borough taxes." 307 Pa. 412, 161 Atl. 552.

As recently as 1964 I stated for a unanimous Court in *McCracken v. Bissett,* 415 Pa. 303, 203 A. 2d 481 (1964), a case in which duly elected school directors who had been refused the right to sit as members of the school board brought a bill in equity seeking an order to compel their seating as members or to oust their successor: "Prior to the filling of the vacancy, mandamus would have been the proper action to compel the temporary chairman at the original meeting to seat the duly elected and qualified school directors. Since the school board has filled the vacancy, quo warranto would now be the proper proceeding to test the action of the board in filling the vacancy with one other than the duly elected and qualified school directors." 415 Pa. 305, 203 A. 2d 481. I maintain that the rule therein enunciated controls the instant matter. Indeed, in *Carroll Township School Board Vacancy Case,* 407 Pa. 156, 180 A. 2d 16 (1962), Mr. Justice MUSMANNO, also speaking for a unanimous Court, held that where an ousted duly-elected school director is asserting his right to office as opposed to his appointed successor, quo warranto is the exclusive procedure to determine the question.

I recognize that confusion in the law has been created by the case of *Commonwealth ex rel. v. Gibbons,* 196 Pa. 97, 46 Atl. 313 (1900), wherein an ousted duly-elected school director sued in mandamus for the restoration of his position and the ouster of his successor. The Court determined that because there was no contest as to plaintiff's original title to his seat under a valid election, but only as to the legality of his ouster for alleged willful absence from meetings, the remedy was mandamus to prevent his further unlawful exclusion. The Court reasoned that the remedy of quo warranto against the successors was not applicable because

the title of the successor was not in issue. I disagree with the Court in *Gibbons* and believe that the *Carroll Township* and *McCracken* cases have overruled that decision. In my view, the issue *is* title to office and due process demands that the succeeding office holder be accorded ample notice of and opportunity to appear in proceedings which seek to declare vacant the office of which he is the current occupant. Indeed, our courts have refused to allow a mandamus action to compel the installation of one person in an office in which there is already an incumbent for to do so would be to try the latter's title to office in a proceeding to which he is not a party. *Commonwealth ex rel. v. Gibson,* 316 Pa. 429, 175 Atl. 389 (1934) ; *Caffrey v. Caffrey,* 28 Pa. Superior Ct. 22 (1905). See *Carroll Township School Board Vacancy Case,* supra.

In my opinion, there is in this case a patent non-joinder of necessary parties in interest so that even though the mandamus action be resolved in favor of plaintiffs there would still not be a final determination, for as the majority opinion leaves this matter, the successors still have the right to proceed in quo warranto against the present plaintiffs. Accordingly, I would affirm the order of the lower court and would require plaintiffs, in order to avoid a circuity of actions, to proceed in quo warranto, joining all parties in interest pursuant to the principle of equity practice that when the court has obtained jurisdiction of the subject matter, it shall include all parties to it and make a final determination of the whole. 11 Standard Pennsylvania Practice 361.

I dissent.