**[J-36-2021]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| DANIEL MOHN, CHAD WALLACE AND IRENE SILVIUS | : | No. 74 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 24 CD |
| v. | : | 2018 dated 3/6/20 affirming the order |
| | : | of the Bucks County Court of Common |
| | : | Pleas, Civil Division, at No. 2016- |
| | : | 03560 dated 12/14/17 |
| BUCKS COUNTY REPUBLICAN | : | |
| COMMITTEE | : | |
| | : | |
| APPEAL OF: DANIEL MOHN | : | ARGUED: May 18, 2021 |

***OPINION***

**JUSTICE SAYLOR**                              **DECIDED: September 22, 2021**

This appeal concerns the jurisdiction of Pennsylvania courts to intervene in the
internal affairs of political parties.

Appellant was a Republican committeeperson of Appellee, the Bucks County
Republican Committee, for the voting district of Yardley Borough.[1]  He was first elected

---

[1] Appellee is an unincorporated association and a political party as defined by Section
801 of the Pennsylvania Election Code.  *See* 25 P.S. §2831(b).  The Rules of the
Republican Party in Bucks County, Pennsylvania (the "Committee Rules"), which serve
as the organization's bylaws, provide that the County Committee is composed of one
committeeman and one committeewoman from each election district in Bucks County,
who are elected by Republican electors at the Primary Election in even numbered years.
*See* Committee Rules, Rule I, art. 1 §A; *id.* Rule II, art. 2; *accord* 25 P.S. §2837 ("There
shall be in each county a county committee for each political party within such county, the
members of which shall be elected at the spring primary, or appointed, as the rules of the
respective parties within the county provide.").

to a two-year term in 2014, and he was reelected on April 26, 2016. This election was conducted in conjunction with the 2016 public primaries, albeit that it served as the sole and dispositive election for committeepersons.

After the election, the acting chairman of Appellee's Ethics Committee sent a letter to Appellant advising him that complaints had been lodged by Bryan McNamara and Nicholas and Sandra Liberato. Complaint dated June 7, 2016, in *Mohn v. Bucks Cty. Republican Comm.*, No. 2016-03560 (C.P. Bucks) ("Complaint"), at Ex. D. Mr. McNamara alleged, among other things, that Appellant had "actively campaigned against an endorsed candidate for committeeman and disparaged the importance and value of the Bucks County Republican Committee Sample Ballot." *Id.* at Ex. I. The letter containing the Liberatos' complaint specifically averred that:

> A [political action committee] controlled by Dan Mohn [and another individual] paid for and sent mailers in support of [an opponent] labeling my wife and I as Liberals, Rhinos[, *i.e.*, Republicans in name only], and a "Union member who pays non-mandatory dues that expand Union Power." They even inferred that I am supportive of Planned Parenthood . . .. These are outrageous lies.

*Id.* at Ex. K. Both complaint letters asserted that Appellant had violated the Code of Ethics contained in Rule VII of the Committee Rules. In his correspondence to Appellant, the acting chairman also related that an investigatory hearing had been scheduled before the Ethics Committee, at which Appellant would be free to present testimony from witnesses and other evidence.

Appellant's counsel responded with requests for documents and information. He also asked for a continuance of at least 30 days, while indicating that the alleged conduct didn't appear to violate any known bylaw or rule of the local committee. Additionally, counsel alluded to *Bentman v. Seventh Ward Democratic Executive Committee*, 421 Pa. 188, 218 A.2d 261 (1966), insofar as the decision reflects that "[m]embership on [a local

party's] committee, a status now legally recognized, is an important right and privilege not only to the person elected but also to the voters who elected such person to act as their representatives on the committee." *Id.* at Ex. G (quoting *Bentman*, 421 Pa. at 199, 218 A.2d at 267).

A short continuance was granted, and Appellant was notified. In response, his counsel took the position that the Code of Ethics reposited in the Committee Rules applied solely to elected and appointed *public* officials, not *party* officials. *See* Complaint dated June 7, 2016, in *Mohn v. Bucks Cty. Republican Comm.*, No. 2016-03560, at Ex. L. As such, counsel opined that the Ethics Committee lacked the authority to conduct any proceedings and asserted that the hearing should be cancelled. In the alternative, counsel reiterated his request for a longer continuance and complained that he hadn't been provided with requested documents. The hearing before the Ethics Committee apparently proceeded nevertheless, and the committee apparently submitted a report and recommendation to the Executive Committee.[2]

On June 7, 2016, Appellant and two other individuals filed a complaint in the court of common pleas seeking declaratory and injunctive relief to prevent their removal as committeepersons, as well as an award of attorneys' fees as a sanction for purported bad faith.[3] The plaintiffs also filed a separate emergency motion asking the court to enjoin the conduct of any hearing before the Executive Committee.

In the complaint, Appellant reiterated his position that the Ethics Code applies only to public officials and not to party officials. He recognized that Rule I, Article 3 of the Committee Rules separately authorizes Appellee's Executive Committee to disqualify an

---

[2] In the record presented, the details of the proceedings before the Ethics Committee are somewhat vague.

[3] The two other individuals subsequently discontinued their participation.

office holder (including a committeeperson) who: is not a qualified Republican elector; has supported a candidate for election in opposition to any nominee of the Republican Party in a general election; or is neglecting or refusing to attend to the duties of his or her office. *See* Complaint at ¶14. He stressed, however, that, under these provisions, the officer holder "shall be given an opportunity for a full hearing before the Executive Committee after due notice of the nature of the charges, the time and place of the hearing, and his or her entitlement generally to the elements of due process in the conduct of such proceedings." Committee Rules, Rule I, art. 3. He further developed, *inter alia*, that only violations of the Rule VII Code of Ethics had been alleged.

The complaint also referenced *Bentman* in support of Appellant's position that Appellee was required both to comply with its own rules and to afford due process "as embodied in the Constitution of the United States." Complaint at ¶15 (citing *Bentman*, 421 Pa. at 199, 218 A.2d at 267). Further, Appellant highlighted that, in addition to his intra-party duties, he had important *public* duties, including nominating candidates for special election for vacancies in local offices. *Id.* at ¶92.[4] In terms of the jurisdiction of the common pleas court, Appellant noted that this Court had explained, "[d]eprivation of [committee] membership and concomitant right of participation in the selection of public officers bears a [d]irect and [s]ubstantial relationship to the electoral processes as to be a matter of judicial concern." *Id.* (quoting *Bentman*, 421 Pa. at 203, 218 A.2d at 269).

---

[4] The Committee Rules provide that "[i]n case of a vacancy on any ticket of any political sub-division or district thereof, the members of the County Committee of the unit affected shall nominate a candidate to fill said vacancy and transmit their action in writing, signed by them, to the County Chairman who, with the Secretary shall certify the action to the County Board of Electors." Committee Rules, Rule VIII, art. 1 §B. Appellee's duty to nominate candidates in special-election scenarios is imposed by the Pennsylvania Election Code. *See* 25 P.S. §2780 ("Each political party shall be entitled to nominate and to file nomination certificates for as many candidates as will be voted for at such special election.").

Finally, the complaint referenced the provision of Section 807 of the Election Code to the effect that a county committee "may make such rules for the government of the party in the county, not inconsistent with law or with the State rules of the party, as it may deem expedient[.]" 25 P.S. §2837. According to Appellant, when Appellee allegedly violated its own rules, it concomitantly offended this provision, since "the Committee may only act consistent with its own rules under 25 P.S. §2837." Complaint at ¶95.

Consideration of the matter by the Executive Committee was deferred pending a hearing before the county court on Appellant's emergency motion for injunctive relief. After the court set a hearing date, Appellee scheduled a hearing before the Executive Committee and gave notice to Appellant. The correspondence indicated that the proceedings were pursuant to the disqualification provisions of Rule 1, Article 3 of the Committee Rules. *See* Bucks Cty. Republican Comm., Exec. Comm. Hearing, N.T., Aug. 11, 2016, at 21, Ex. HQ 3.

Appellant's counsel responded with a letter objecting to the hearing on the basis of the matters set forth in the complaint filed in the county court. Counsel also posited: "[It] appears the disqualification hearing has been scheduled for some improper purpose, possibly as an attempt to harass and embarrass Mr. Mohn, or as an attempt to intimidate or control Mr. Mohn's conduct." *Id.* at 16, Ex. HQ 1.

The common pleas court denied relief on the emergency injunction and the hearing before the Executive Committee ensued. Neither Appellant nor his counsel appeared, but a hearing master read into the record the contents of counsel's most recent correspondence advancing Appellant's objections. The hearing master proceeded to introduce a "Committeepeople Resolution," which had been signed and accepted by Appellant, indicating, *inter alia*, that he would "help endorsed Republicans running for

office in accordance with the Bucks County Republican Committee bylaws," and "cover polls on election day, distribute the sample ballot." *Id.* at 19, Ex. HQ 2.

An attorney representing the complainants invoking the Ethics Code was then permitted to present testimony and evidence. Consistent with his complaint letter, Nicholas Liberato explained that, during his campaign for reelection as local committeeperson, he become aware that Appellant was circulating flyers printed through a political action committee of which Appellant was the treasurer. *See id.* at 31. According to Mr. Liberato, the flyers falsely accused him of working against conservative values; working to expand union power; acting as a Republican in name only; and altering the sample ballot to include trial lawyers, union members, and a former Planned Parenthood executive. *Id.* at 27-29. Mr. Liberato also noted that the flyer contained Appellant's personal return address. On Election Day, Mr. Liberato attested, he had learned that Appellant was in his (the witness's) election district distributing sample ballots prepared by the political action committee in support of the opposing candidate. It was Mr. Liberato's position that Appellant had no reason to be at his (again, the witness's) polling station on the day of the primary, and that Appellant should have been at his own polling station in Yardley Borough. *See id.* at 33. Mr. Liberato indicated that, although he was the endorsed candidate,[5] he lost the election by two votes. *See id.* at 36-37.

Bryan McNamara similarly testified that he had learned of flyers opposing his own candidacy distributed by Appellant, and that Appellant appeared at his (the witness's) polling station on the afternoon of Election Day distributing sample ballots in support of the opposing candidate. *See id.* at 47-54.

At the conclusion of the hearing, the Executive Committee voted to disqualify Appellant as a committeeperson and declare his office vacant. *See id.* at 86. Appellee's

---

[5] There were conflicting assertions about whether the party endorses committeepersons. *Compare* Exec. Comm. Hearing, N.T., Aug. 11, 2016, at 36, *with id.* at 60.

chairman later accepted the Executive Committee's recommendation to this effect and issued the declaration.

Appellant and Appellee proceeded to file cross-motions for summary judgment in the litigation before the common pleas court. The gravamen of Appellee's position -- which was credited by the county court -- was that the matter was a purely intra-party dispute with no direct or substantial relationship to any state interest. As such, Appellee successfully asserted that its right to political association under the First and Fourteenth Amendments to the United States Constitution prohibited the court from assuming jurisdiction. Bucks County Republican Committee's Cross-Motion for Summary Judgment in *Mohn*, No. 2016-03560, at ¶2. *See generally Democratic Party of the U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 122, 126, 101 S. Ct. 1010, 1019 (1981) ("This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State[,]" and "the freedom to associate for the 'common advancement of political beliefs,' necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only" (quoting *Kusper v Pontikes*, 414 U.S. 541, 56, 94 S. Ct. 303, 307 (1973)); *Cousins v. Wigoda*, 419 U.S. 477, 487, 95 S. Ct. 541, 547 (1975) ("The National Democratic Party and its adherents enjoy a constitutionally protected right of political association.").

The Commonwealth Court affirmed in a divided, non-precedential opinion. *See Mohn v. Bucks Cty. Republican Comm.*, 24 C.D. 2018, *slip op.*, 2020 WL 1079247 (Pa. Cmwlth. Mar. 6, 2020). Consistent with Appellee's position, the majority opinion stressed Appellee's associational rights and distinguished *Bentman* on the basis that "[Appellant's] removal from office is in no way related to [Appellee's] *present selection* of party nominees for public office." *Id.* at *7 (emphasis added). According to the dissent, however, such a

narrow reading of *Bentman* "renders its analysis superfluous." *Id.* at *11 (McCullough, J., dissenting).

Appeal was allowed to consider whether the county court had jurisdiction under *Bentman*. *See Mohn v. Bucks Cty. Republican Comm.*, ___ Pa. ___, 241 A.3d 1094 (2020) (*per curiam*).[6] Given that the framing the issue turns on *Bentman*, we open with a summary of the decision.

In *Bentman*, two local Democratic Party committeepersons in the Philadelphia area were removed from their positions for alleged disloyalty manifested in their support of an unendorsed candidate for the Democratic nomination for the United States Senate.[7] Along with several party electors, they commenced a mandamus action against the local party's executive committee. The committee interposed preliminary objections, which were sustained by the county court "[s]olely upon the jurisdictional ground that courts will not interfere with the actions and internal organization of a political party." *Id.* at 191, 218 A.2d at 263. This Court, however, held that the common pleas court had erred in finding that jurisdiction was lacking. *See id.* at 203, 218 A.2d at 269.

Initially, the *Bentman* Court recognized the historical approach that "[p]olitical parties . . . must govern themselves by party law. The courts cannot step in to compose

---

[6] The matter might be regarded as technically moot, since the term of party office to which Appellant was elected has now expired. Appeal wasn't allowed, however, to address mootness considerations, and in any event, it appears that the scenario could evade our review if we declined the present consideration. *See generally DEP v. Cromwell Twp., Huntingdon Cty.*, 613 Pa. 1, 21, 32 A.3d 639, 652 (2011) (discussing the exceptions to the mootness doctrine).

[7] Notably, unlike the present circumstances, the alleged conduct occurred prior to the time that the committeepersons were first elected to their positions. *See Bentman*, 421 Pa. at 190 n.1, 218 A.2d at 263 n.1 ("The alleged disloyalty took place at a time when Cox and Schuchman were not party committeemen.").

party wrangles or to settle factional strife." *Id.* at 192, 218 A.2d at 264 (quoting *Kearns v. Howley*, 188 Pa. 116, 122, 41 A. 273, 275 (1898)); *see also Kenneck v. Pennock*, 305 Pa. 288, 157 A. 613 (1931) (*per curiam* opinion) (refusing to entertain a challenge to the removal of a local party committeeperson, as the party leaders "are amenable alone to their party which is purely political" (quoting *Kearns*, 188 Pa. at 121, 41 A. at 274).[8]

The Court related, however, that the General Assembly had subsequently enacted legislation providing for the constitution of local political committees via election or appointment, with the members being "subject to the control, direction and supervision of the political committee of which they are members." *Bentman*, 421 Pa. at 193, 218 A.2d at 264 (quoting 25 P.S. §2842). Per this provision, the *Bentman* Court pronounced: "[I]t is evident that the legislature recognized a status in law in party committees and committeemen." *Id. But see supra* note 8. The Court also highlighted that offices of party committees had come to be filled through the same electoral processes and under the same statutory authority as public offices. *See id.* at 194, 218 A.2d at 265.

Against this background, the Court proceeded to frame the question presented as "whether the electors of a political party have a right, cognizable in a court of law, to choose whom they will to represent them in their party's organization and councils[.]" *Id.* at 195, 218 A.2d at 265.[9] The Court continued:

---

[8] Contrary to *Bentman* as discussed below, the *Kennock* Court discerned no difference deriving from the fact that committee offices are addressed by statute. *See Kennock*, 305 Pa. at 289-90, 157 A. at 614 ("It is unnecessary to quote the act, as it is apparent appellants confuse *public* officers with *party* officers. A reading of the act clearly reveals that the familiar distinction between party officers and public officers is expressly observed." (emphasis in original)).

[9] The Court also observed that the committeepersons hadn't been removed "for anything which they had done as committeemen or in their representative capacity but by reason of that which it is alleged they had done prior to their election and selection." *Id.* at 195-96, 218 A.2d at 266; *see supra* note 7.

> The Executive Committee, by its action, has ignored the fact that these two persons by a majority of the party electorate were chosen to represent them, has rendered the electoral process a nullity and a farce, has denied the majority of the party electors the right to be represented by persons of their choice in the party councils and now urge[s] that the courts, because a political party is a private and not a public entity, are powerless to intervene.

*Id.* at 196, 218 A.2d at 266.

While characterizing the historical forbearance by courts from interfering in intra-party matters as "understandable," the *Bentman* Court found that legislative developments had altered the status quo. It highlighted, in particular, that the General Assembly had imposed the performance of some public functions on political parties, directly affecting the public at large and the government. *See id.* at 196, 218 A.2d at 266 ("Today, however, the relationship between political parties, the government and the public has become such that, in many areas, the public interest is not only *directly* affected by political parties but such parties actually perform *public* functions imposed upon them by law." (emphasis in original)). Given the intermixing of some pubic matters with party matters manifested in the Pennsylvania Election Code -- and particularly the delegation to local committees of the responsibility to make nominations for public office in special-election scenarios -- the Court found that local political parties can undertake state action, rendering their actions amenable to judicial review pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See id.* ("Insofar as a political party performs statutorily-imposed public functions and to the extent that its actions constitute state action, the internal organization of such political party is a matter of such concern to the public as to make it subject to constitutional limitations and judicial

restraint.").[10] Relative to the circumstances before the Court, it relied, in particular, on the fact that the local Democratic committee was responsible to nominate several candidates for judgeships created too late for the positions to be included in the primary election. *See id.* at 199, 218 A.2d at 267.

Significantly, *Bentman* doesn't hold that all actions by party committees constitute state action. *See id.* at 197, 218 A.2d at 266 ("The invocation of judicial interference in this area must be restricted or circumscribed[.]"). Rather, the Court fashioned a requirement that the action or actions under consideration must bear a "*direct* and *substantial* relationship to the performance of *public* functions by the political party." *Id.* at 197, 218 A.2d at 266 (emphasis in original); *see also id.* at 196-97, 218 A.2d at 266 ("Judicial interference, even with the internal organization of a political party, is justifiable if such internal organization may *directly affect* the performance of a public function and the public interest." (emphasis added)).

Returning to the premise that the new regime for judicial review of certain intra-party matters derived from the "legal status" of party committeepersons and political committees accorded by the General Assembly, the Court next addressed the argument that the statute's explicit allocation of control, direction, and supervision of committeepersons to the political committee should be read to maintain the status quo relative to the withholding of jurisdiction in the courts. In the *Bentman* Court's judgment, such approach would be "patently absurd and unreasonable," in that it would allow political committees to "nullify and ignore, without legal cause, the results of . . .

---

[10] *See also id.* at 202, 218 A.2d at 269 ("When the activity of a party organization in such area or when its internal organization and membership has a direct bearing on its activity in such area is challenged as constitutionally offensive and it is claimed that, in the performance of its statutorily imposed duties amounting to state action, the party organization violates the concept of due process, then the judiciary not only *may* but must intervene." (emphasis in original)).

election[s.]" *Id.* at 198, 218 A.2d at 267. Instead, the Court expressed the aim of the legislation in the following terms taken from the decision of the Court of Appeals of New York in *Coffey v. Democratic General Committee*, 58 N.E. 124 (N.Y. 1900):

> The dominant idea pervading the entire statute is the absolute assurance to the citizen that his wish as to the conduct of the affairs of his party may be expressed through his ballot, and thus given effect, whether it be in accord with the wishes of the leaders of his party or not, and that thus shall be put in effective operation, in the primaries, the underlying principle of democracy, which makes the will of an unfettered majority controlling. In other words, the scheme is to permit the voters to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards.

*Bentman*, 421 Pa. at 198-99, 218 A.2d at 267 (quoting *Coffey*, 58 N.E. at 126).

The *Bentman* Court also emphasized that it was required to construe the statutory language, if possible, in such a manner as not to violate due process norms embodied in the United States Constitution. *See id.* at 199, 218 A.2d at 267; *see also id.* at 203, 218 A.2d at 269 ("Membership on that committee carries with it the right to participate in the selection of the political body which, under the legislative direction, in certain instances, selects the nominees for public office, an activity clearly constituting state action under the 14th Amendment."). It also reiterated that committee membership is an important right and privilege not only to the person elected but also to the voters who elected the person to act in a representative capacity. *See id.* at 203, 218 A.2d at 269. The Court then concluded:

> To the extent that the instant action of the Executive Committee bears a relationship to the state action inherent in the selection of party nominees for public offices, such action may be tested in the judicial area to determine whether the action of the Executive Committee denying membership on the Committee to the chosen representatives of the party

electorate offends against the constitutional provision mandating due process in state action.

*Id.*

The *Bentman* decision isn't clear in terms of how direct the nexus with public affairs must be to justify the contemplated judicial interference in local intra-party matters. On the one hand, there is language in the decision that suggests that the mere conferral of some public function to a committee generally renders committee actions relative to the composition of its membership reviewable.[11] On the other hand, the *Bentman* Court relied on a discrete nomination scenario in which the particular party committee in issue was charged with making actual nominations for public office, *see id.* at 199-200, 218 A.2d at 267-68, and the Court sustained a strong theme throughout centered on the requirement of directness.

The present dispute centers on just how broadly *Bentman* should be read, particularly in terms of its "direct and substantial" litmus for state action. Appellant, for his part, advocates the broader interpretation. Although Appellant hasn't identified any specific vacancy in public office arising during the term of the party office for which he was elected, he stresses that the *Bentman* Court admonished that "[j]udicial interference, even within the internal organization of a party, is justifiable if such internal organization *may* directly affect the performance of a public function and the public interest." Brief for Appellant at 14 (quoting *Bentman*, 421 Pa. at 196-97, 218 A.2d at 266) (emphasis in original). According to Appellant, the word "may," in this context, means that "trial courts

---

[11] *See, e.g.*, *id.* at 202, 218 A.2d at 269 ("The assumption of such obligations [to select nominees in special-election scenarios] by party organizations has marked the entry by such party organizations into an area of public activity which renders their activities in such area amenable to judicial supervision."); *id.* at at 202, 218 A.2d at 269 ("Inasmuch as the legislature has seen fit to impose on political party organization certain duties which bear a *direct* and *substantial* relationship to the selection of public officials by the electoral process the *complete* privacy in nature of party organization recognized by our courts in the past no longer exists." (emphasis in original; footnote omitted)).

have jurisdiction to intervene any time a political party interferes with a committeeperson's *ability* to perform a duty to participate in the selection of candidates for local political offices." *Id.* at 14-15 (emphasis in original); *see also id.* at 20 ("If a vacancy in local [public] office occurs, there is no guarantee that future litigation could be resolved in time for [Appellant] to participate in the nomination of the candidate in the timeframe necessary for selecting the candidate and holding the special election. [Appellant] must not wait for such vacancy to occur").

Appellee, conversely, advocates the narrower approach to *Bentman*. *See, e.g.*, Brief for Appellee at 10 ("The holding in *Bentman* is much more discrete than that proposed by Appellant, because there the Democratic Party was participating in 'state action,' substituting its internal vote for a primary election for judicial offices."). According to Appellee, "Appellant consistently and incorrectly conflates his duties as the occupant of a party office by alleging a purely hypothetical 'state action' by [Appellee.]" *Id.* at 10-11; *see also id.* at 11-13 (characterizing the nexus with public functions relied upon by Appellant as "indirect, remote and contingent" and "inchoate or speculative"). Accepting Appellant's expansive reading of *Bentman*, Appellee posits, would cause an exception to overwhelm the rule. *See id.* at 13 ("Political parties would be deprived of any right to define and determine their membership by removing members exhibiting hostility to their 'shared beliefs' because a duty to perform a state action *could* occur at any time during the term of a party officer." (emphasis in original)). Appellee also continues to rely on the line of decisions of the United States Supreme Court reaffirming the strength of the constitutional right of political association invested in political parties.

Upon review of *Bentman*, we find it to be remarkable that no mention is made of the political party's constitutional right of association. *See generally* Harvard Law Review Association, *State Regulation of National Political Parties*, 95 HARV. L. REV. 241, 247 n.34

(1981) (observing, with reference to *Bentman*, that "[m]any states have applied their law to local and state political parties without considering possible freedom of association claims"). Presumably, the omission results from the wide-scale development and clarification of this right after 1966, when the *Bentman* decision was rendered. *See generally* Michael L. Stokes, *When Freedoms Conflict: Party Discipline and the First Amendment*, 11 J.L. & POL. 751, 772 (1995) ("Throughout the 1970s, as the lower federal courts were fashioning a body of law protecting legislators from party discipline, the Supreme Court was proceeding in a different direction, developing a constitutional right of association as part of its First Amendment jurisprudence."); *Ripon Soc'y, Inc. v. Nat'l Republican Party*, 525 F.2d 567, 586 (D.C. Cir. 1975) ("Last term the [Supreme] Court in *Cousins v. Wigoda* placed the internal workings of a political party squarely within the protection of the First Amendment.").[12]

---

[12] In *Ripon Society*, the United States Circuit Court of Appeals for the District of Columbia opined:

> There are a number of respects . . . in which the [political] parties conduct their affairs other than by giving equal attention to the preferences of all voters, or even all party adherents. Perhaps this is not surprising. A party is after all more than a forum for all its adherents' views. It is an organized attempt to see the most important of those views put into practice through control of the levers of government. One party may think that the best way to do this is through a "strictly democratic" majoritarianism. But another may think it can only be done (let us say) by giving the proven party professional a greater voice than the newcomer. Which of these approaches is the more efficacious we cannot say, but the latter certainly seems a more accurate description of how political parties operate in reality.

> What is important for our purposes is that a party's choice, as among various ways of governing itself, of the one which seems best calculated to strengthen the party and advance

Significantly, in *Wigoda v. Cousins*, 302 N.E.2d 614 (Ill. App. Ct. 1973), an Illinois appellate court cited *Bentman* and the New York Court of Appeals' decision in *Coffey*, upon which *Bentman* relied, in support of the proposition that "[t]he interest of the state in protecting the right to participate in primaries is superior to whatever other interests the party itself might wish to protect." *Wigoda*, 302 N.E.2d at 629. The Supreme Court of the United States disagreed, however, and the Illinois appellate court's decision was overturned with emphasis on the political party's right to freedom of association. *See Wigoda*, 419 U.S. at 488-91, 95 S. Ct. at 547-49.

We are not asked here to reconsider and/or to overrule *Bentman* but only to decide how broadly it should be read.[13] Particularly upon consideration of Appellee's right of

> its interests, deserves the protection of the Constitution. . ..
> [T]here must be a right not only to form political associations
> but to organize and direct them in the way that will make them
> most effective.

*Ripon Soc'y*, 525 F.2d at 584-85 (footnotes omitted). Notably, the Supreme Court of the United States cited affirmatively to a concurrence, in *Ripon*, for the proposition that the political parties have the right to select a "standard bearer who best represents the party's ideologies and preferences." *Eu v. San Francisco Cty. Democratic Centr. Comm.*, 489 U.S. 214, 224, 109 S. Ct. 1013, 1021 (1989) (quoting *Ripon Soc'y*, 525 F.2d at 601 (Tamm, J, concurring)).

[13] Similarly, we are also not asked to (and do not) consider whether there may be other circumstances, beyond the state-action criterion, that might justify judicial review of ostensibly intra-party matters. Notably, under the decisional law of the United States Supreme Court, intervention in derogation of a political party's associational rights can be appropriate when there is a compelling state interest. *See, e.g.*, *Eu*, 489 U.S. at 231, 109 S. Ct. at 1024. In this regard, that Court has been careful to express reservations about unduly constraining legitimate governmental regulation and, by analogy at least, judicial review. *See, e.g.*, *id.* at 232, 109 S. Ct. at 1025 ("This . . . is not a case where [government] intervention is necessary to prevent the derogation of the civil rights of the party adherents."); *McMenamin v. Phila. Cty. Democratic Exec. Comm.*, 405 F. Supp. 998, 1001 (E.D. Pa. 1975) (refusing involvement in an internal party dispute over selection of a ward leader absent any racial, geographic, or fraudulent aspect).

political association, we choose the narrower of the interpretations with which we are now presented.[14] As developed above, under this approach, an individual must point to some discrete acts or actions entailing state action to establish the required direct-and-substantial nexus, such as the nomination of candidates for local judgeships raised in *Bentman*. Since Appellant has failed to do so, we credit Appellee's position that, "through its internal, self-organized apparatus, [it was] permitted to construe its own governing rules and to disqualify elected occupants of its offices from participation in its affairs by exercising its own judgment, free from judicial interference." Brief for Appellee at 6.

We acknowledge Appellant's invocation of the rights of the voters who elected him. It is far from certain, however, that those voters would chose to continue to support him in his departure from the will of their own party. *Compare Bentman*, 421 Pa. at 190, 218 A.2d at 263 (presenting a scenario in which several electors joined the affected committeepersons in challenging the party's actions). In any event, we have considered the fact that Appellant was elected as a committeeperson in a public election in the above calculus, relative to respective rights and interests involved.

The order of the Commonwealth Court is affirmed.

---

[14] *Accord Eu*, 489 U.S. at 230, 109 S. Ct. at 1024 ("Freedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders."); *La Follette*, 450 U.S. at 122 n.22, 101 S. Ct. at 1019 n.22 ("Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." (quoting LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 791 (1978))). *See generally* Robert C. Wigton, *American Political Parties Under the First Amendment*, 7 J.L. & POL'Y 414-15 (1999) (explaining that "American political parties have always occupied a gray area of constitutional law because of their dual public-private nature," and positing that, "[i]n its more 'private' functions, such as selection of party leaders, the parties should retain maximum independence from government regulation, including judicial oversight.").

Chief Justice Baer and Justices Todd, Dougherty and Mundy join the opinion.

Justice Wecht files a concurring opinion.

Justice Donohue concurs in the result.