**[J-36-2021] [MO: Saylor, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| DANIEL MOHN, CHAD WALLACE AND IRENE SILVIUS | : | No. 74 MAP 2020 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 24 CD |
| v. | : | 2018 dated March 6, 2020 Affirming |
| | : | the Order of the Bucks County Court |
| | : | of Common Pleas, Civil Division, at |
| BUCKS COUNTY REPUBLICAN | : | No. 2016-03560 dated December |
| COMMITTEE | : | 14, 2017. |
| | : | |
| | : | ARGUED: May 18, 2021 |
| APPEAL OF: DANIEL MOHN | : | |

**CONCURRING OPINION**

**JUSTICE WECHT**                    **DECIDED: September 22, 2021**

I join the Court's conclusion that the Bucks County Republican Committee was

empowered to expel Daniel Mohn from his position as an elected committeeman and that

the Committee's decision was not subject to judicial review. However, I differ with the

Majority's efforts to distinguish this matter from the sweeping jurisdictional rule announced

in *Bentman v. Seventh Ward Democratic Executive Committee*, 218 A.2d 261 (Pa. 1966).

The *Bentman* Court misconstrued the state action doctrine and departed from

longstanding precedent when it authorized the judiciary to interfere with the associational

freedoms guaranteed to political parties by the First Amendment to the United States

Constitution. The *Bentman* rule persists despite nearly half-a-century of case law from

the Supreme Court of the United States expressly curbing the judiciary's power to second-

guess political parties' internal personnel decisions. Since *Bentman* arguably is no longer

good law, I would overrule it and align our jurisprudence with the High Court's decisions. Accordingly, I respectfully concur only in the result reached by today's Majority.

A close examination of the *Bentman* decision demonstrates the folly of preserving it. Decided in 1966, *Bentman* came at the height of the Civil Rights Movement, when state and federal courts began to wade into political disputes that they previously had avoided.[1] Before *Bentman*, Pennsylvania courts expressly declined to meddle with the internal machinations of political parties, concluding that there is no right of property in party membership that could be enforced in equity. *See Kearns v. Howley*, 41 A. 273, 275 (Pa. 1898) ("[P]olitical parties and party government are unknown to the law. They must govern themselves by party law. The courts cannot step in to compose party wrangles, or to settle factional strife. If they attempted it, it may well be doubted whether they would have much time for anything else."); *Kenneck v. Pennock*, 157 A. 613, 614 (Pa. 1931) (*per curiam*) ("Ward committeemen have no municipal duties to perform, receive no compensation from the municipality, and the committee in which they may have membership is not a creature of the government, but solely pertains to an essentially political party.").

To the extent that the courts assumed jurisdiction to resolve intraparty disputes, it was limited to controversies arising from the "use of the public election machinery," as occurs when the political parties elect their officers during the spring primaries pursuant to Section 603 of the Election Code. *See Commonwealth ex rel. Koontz v. Dunkle*,

---

[1] *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 209 (1962) (holding that challenges to a State's legislative redistricting process are justiciable under the Fourteenth Amendment), *abrogating Colegrove v. Green*, 328 U.S. 549, 556 (1946) (plurality) ("Courts ought not to enter this political thicket.").

50 A.2d 496, 496 (Pa. 1947) (citing 25 P.S. § 2753 ("General Primary; Candidates to Be Nominated *and Party Officers to Be Elected*") (emphasis added)). But the courts' authority to settle election contests and ballot disputes did not extend to forcing private parties to associate with one another. *See id.* at 497 ("'The courts can compel the issuance of a certificate of election to a party officer who has been elected, [(*i.e.* by the public machinery)] . . ., but it cannot compel the members so elected to associate with each other . . . .'") (quoting *Horan v. Blenk*, 17 Pa. D. 363, 1908 WL 3410 at *2 (C.P. Phila. Cty. 1908) (bracketed material added in *Koontz*)).

The dispute in *Bentman* arose following the April 1964 Democratic primary election in Philadelphia County. A majority of Democratic voters in the 6th and 10th Divisions of the City's 7th Ward elected Donald W. Cox and Hedvah Shuchman, respectively, to serve as members of the 7th Ward Democratic Executive Committee. Their elections were certified and they were seated "without question." *Bentman*, 218 A.2d at 263. On August 10, 1964, Cox and Shuchman were notified that an Executive Committee meeting would be held two days later to consider and vote upon their removal as members of the committee. *Id.* The ward leader, Harry Melton, charged them "with having failed to act in harmony with the Executive Committee" after they allegedly supported and worked for the nomination of a candidate for the Democratic Party's nomination for the United States Senate who had not been endorsed by the party—despite the fact that their supposed disloyalty occurred before they had been elected to the committee. *Id.* at 263 & n.1. The Executive Committee removed them by a vote of 17-5. Melton then appointed two others to fill the vacancies on the committee. *Id.* at 263.

Luba Bentman and Patricia Evers, two Democratic Party electors who had voted for Cox and Shuchman at the primary election, joined them in filing "a *mandamus* action against the Executive Committee, Melton, . . . and Francis Smith, Chairman of the Democratic County-City Committee." *Id.* The plaintiffs averred that: (i) Cox and Shuchman did not receive notice of the charges against them; (ii) the charges did not constitute grounds for removal; (iii) Cox and Shuchman's request to Smith concerning the matter and procedure for appealing their removal was ignored; (iv) the removal was without cause and due process in violation of the committee members' constitutional rights; and (v) Cox and Shuchman had been denied their right and privilege to take part in party functions as regularly elected party committeemen. *Id.* The defendants filed preliminary objections asserting, *inter alia*, a lack of subject matter jurisdiction, which the Court of Common Pleas of Philadelphia County sustained "[s]olely upon the jurisdictional ground that courts will not interfere with the actions and internal organization of a political party." *Id.* The plaintiffs appealed to this Court.

The *Bentman* majority began its analysis by noting the plaintiffs' concession that, from the late nineteenth century until at least 1947, Pennsylvania courts would not entertain this type of litigation in law or equity. *Id.* (citing *Koontz*, 50 A.2d at 496-97 (affirming trial court order denying issuance of writ of *quo warranto* to test the right to office of county chairman of a political party, reasoning that party offices are private, not public)); *see also Kenneck*, 157 A. at 613-14 (adopting the trial court's opinion denying relief to duly elected Philadelphia Republican Party ward members who were excluded from committee membership because appellants were party, not public, officers and thus answered to their party alone)). The plaintiffs asserted that changes in statutory law and

the impact of recent federal court decisions necessitated reconsideration of the established rule.

Pertinently, in July 1947, six months after *Koontz* was decided, the General Assembly added Section 812 to the Election Code, which provides:

> Whenever two or more members of a political party shall be elected or appointed, as the rules of the party may provide, as members of a political committee to represent the members of such party in the respective election districts, such members shall constitute a political committee of said party to function within such election district: Provided, that, When acting in the capacity of a political committee, such duly elected or appointed members shall be subject to the control, direction and supervision of the political committee of which they are members.

25 P.S. § 2842 ("District committees"). Cox and Shuchman suggested that Section 812 "confer[red] upon political or party committeemen such legal status as to make them amenable to the jurisdiction of the courts." *Bentman*, 218 A.2d at 264. The *Bentman* Court agreed, viewing Section 812 as evidence of the General Assembly's intent to "recognize[] a status in law in party committees and committeemen." *Id.* at 264-65; *see id.* at 265 ("It is clear beyond question that certain party offices, including that of party committee, are now filled through the same electoral process and under State statutory authority as public offices, except that voting for party offices is restricted to qualified electors of the party.").

The Court observed that Cox and Shuchman were removed from offices to which they were duly elected not because of anything they did while in office, but due to allegations of conduct that preceded their elections. *Id.* at 266. Given those grounds for disqualification, the Court stressed that

> [t]he Executive Committee, by its action, has ignored the fact that these two persons by a majority of the party electorate were chosen to represent them, has rendered the electoral process a nullity and a farce, has denied the majority of the party electors the right to be represented by persons of their

choice in the party councils and now urge that the courts, because a political party is a private and not a public entity, are powerless to intervene.

*Id.* The Court then explained away the judiciary's past reluctance to interfere with internal party management by pointing to what it considered to be the integration of political party governance within Pennsylvania law.

> The relationship between political parties, the government and the public has become such that, in many areas, the public interest is not only directly affected by political parties but such parties actually perform public functions imposed upon them by law. Insofar as a political party performs statutorily-imposed public functions and to the extent that its actions constitute state action, the internal organization of such political party is a matter of such concern to the public as to make it subject to constitutional limitations and judicial restraint. When the internal organization of a political party directly affects its performance of such public function then not only may the judiciary intervene but it must intervene.

*Id.* (capitalization altered).

The Court justified its departure from its early cases by invoking the doctrine of "state action" under the Fourteenth Amendment, "the extension [of which] in recent years" it viewed as reflecting "a change of judicial thinking in this area of the law." *Id.* Since the General Assembly had "seen fit to impose upon political party organizations the performance of certain public functions which directly affect the public and our government," the Court reasoned that "[j]udicial interference, even with the internal organization of a political party, is justifiable if such internal organization may directly affect the performance of a public function and the public interest." *Id.* Nonetheless, the Court cautioned that such interference "must be restricted or circumscribed"—*i.e.*, it "must be limited to controversies where the issue raised bears a direct and substantial relationship to the performance of public functions by the political party." *Id.* (capitalization altered).

In the Court's view, the addition of Section 812 in 1947 "clearly gave recognition to the legal status of party committeemen and political committees, the lack of which up to that time had been questioned by our courts." *Id.* But what effect should be given to the statute's proviso giving the "control, direction and supervision" of party committeemen to the parties themselves? The Court responded with two rules of statutory construction: the presumptions that the Legislature does not intend absurd or unreasonable results; and that it does not intend to violate the Constitutions of the United States or Pennsylvania. *Id.*

On this basis, the Court reasoned that it would be indefensible to construe the "control, direction and supervision" language of Section 812 to mean that the Executive Committee has "the authority to refuse recognition to the choice of the party electors in the selection of party committeemen and to refuse to allow them to act as party committeemen." *Id.* at 266-67.

> [P]arty electors are expressly given the right to select their representatives on the political committee at an election paid for out of the public treasury and conducted under official government auspices . . . . [I]f after all this legislatively provided procedure, the Executive Committee of the ward is to have the right, under the guise of 'control, direction and supervision' of the party committeemen, to nullify and ignore, without legal cause, the results of such election and selection of party committeemen, we reach a result patently absurd and unreasonable.

*Id.* at 267; *see id.* (citing *People ex rel. Coffey v. Democratic Gen. Comm.*, 58 N.E. 124, 126 (N.Y. 1900), for the proposition that the aim of such election statutes "is the absolute assurance to the citizen that his wish as to the conduct of the affairs of his party may be expressed through his ballot, and thus given effect, whether it be in accord with the wishes of the leaders of his party or not. . . . In other words, the scheme is to permit the voters

to construct the organization from the bottom upwards, instead of permitting leaders to construct it from the top downwards").

Drawing inspiration from the New York Court of Appeals' decision in *Coffey*, the *Bentman* Court observed that the Election Code "and other legislation" mandates that the parties "perform functions which are definitely [p]ublic in character." *Id.* These functions include: (i) filling vacancies that occur after a primary election by reason of death or withdrawal of a candidate (25 P.S. § 2939); (ii) selecting the party's nominee in the event of a special election to fill a vacancy in Congress or the General Assembly (*id.* § 2780); and (iii) consulting with the party county chairman in special emergencies before making appointments to fill existing vacancies in the legislature (46 P.S. § 145.7) and the judiciary (71 P.S. § 779.8). *Bentman*, 218 A.2d at 267.

The Court then homed in on "a striking example of [d]irect action by a political party in a public function" identified by Cox and Shuchman, namely, the creation of additional judgeships in Philadelphia County by the General Assembly in 1964. *Id.* Because these new seats were created too late in the year for candidates to be nominated by the electorate at the regularly scheduled primary election, the parties were permitted to name their nominees for the judgeships in accordance with their party rules pursuant to Section 993 of the Election Code. *Id.* (citing 25 P.S. § 2953). The selection of nominees for these new seats allegedly animated the 7th Ward leaders to remove the erstwhile apostates, Cox and Shuchman, from their positions on the local committee without cause, because the local committees select the members who would serve on the Democratic County Committee, which ultimately would name the candidates for these judgeships. *Id.* As Cox and Shuchman saw it, their removal deprived them of a right to participate in, and

cast their votes for, the individuals who would constitute the county committee. *Id.* at 267-68. The removal likewise deprived the plaintiff voters (Bentman and Evers) of their right to select the party's ward representatives, who would then vote for the county committee members tasked with making the nominations. *Id.* at 268.

Lastly—and perhaps most significantly—the Court, without any analysis, simply cited the U.S. Supreme Court's decision in *Smith v. Allwright*, 321 U.S. 649 (1944), for the proposition that the selection of party nominees for a general election is state action subject to constitutional constraint. *Bentman*, 218 A.2d at 268.[2] Summarizing its view of the prevailing state of the law in 1966, the Court offered the following observations:

> Inasmuch as the legislature has seen fit to impose on political party organization certain duties which bear a direct and substantial relationship to the selection of public officials by the electoral process[,] the complete privacy in nature of party organization recognized by our courts in the past no longer exists. The assumption of such obligations by party organizations has marked the entry by such party organizations into an area of public activity which renders their activities in such area amenable to judicial supervision. When the activity of a party organization in such area or when its internal organization and membership has a direct bearing on its activity in such area is challenged as constitutionally offensive and it is claimed that, in the performance of its statutorily imposed duties amounting to state

---

[2] *See also Bentman*, 218 A.2d at 268 (citing *Bell v. Georgia Dental Assoc.*, 231 F. Supp. 299 (N.D. Ga. 1964) (finding that exclusion of racial minority groups from the right to participate in the Dental Association's selection of names for appointment to state agencies violated the U.S. Constitution; even though dental associations are generally private in character, the legislature gave them the power to engage in state action by making nominations); *Rice v. Elmore*, 165 F.2d 387, 391 (4th Cir. 1947) ("When these [party] officials participate in what is a part of the state's election machinery, they are election officers of the state *de facto* if not *de jure*, and as such must observe the limitations of the Constitution. Having undertaken to perform an important function relating to the exercise of sovereignty by the people, they may not violate the fundamental principles laid down by the Constitution for its exercise.")). *But see Lynch v. Torquato*, 343 F.2d 370, 372 (3d Cir. 1965) ("[T]he citizen's constitutional right to equality as an elector . . . applies to the choice of those who shall be his elected representatives in the conduct of government, not in the internal management of a political party.").

action, the party organization violates the concept of due process, then the judiciary not only may but must intervene.

The challenge in this action is to the right of a party committee to refuse recognition of membership on such committee to persons who have been lawfully elected to such membership by a majority of the qualified party electors. Membership on such committee, a status now legally recognized, is an important right and privilege not only to the person elected but also to the voters who elected such person to act as their representatives on the committee. Membership on that committee carries with it the right to participate in selection of the political body which, under the legislative direction, in certain instances, selects the party nominees for public office, an activity clearly constituting state action under the 14th Amendment. Deprivation of such membership and the concomitant right of participation in the selection of public officers bears such a direct and substantial relationship to the electoral process as to be a matter of judicial concern; only by the intervention of the courts can the constitutional limitations on the exercise of state action be safeguarded.

To the extent that the instant action of the Executive Committee bears a relationship to the state action inherent in the selection of party nominees for public offices, such action may be tested in the judicial area to determine whether the action of the Executive Committee denying membership on the Committee to the chosen representatives of the party electorate offends against the constitutional provision mandating due process in state action.

*Id.* at 269 (capitalization altered; footnote omitted). Under these circumstances, the Court

held that the trial court's determination that it lacked jurisdiction to consider the plaintiffs'

*mandamus* action was erroneous.[3]

---

[3] Justice Cohen dissented, criticizing the majority for holding that courts have jurisdiction to issue writs of *mandamus* compelling the reinstatement of ousted committee members of political parties where no vacancies existed in those party offices. *Bentman*, 218 A.2d at 269-70 ("In so holding, the majority may have overlooked one crucial fact—that before the outsiders can get in, the insiders must be ordered out. And this, I am afraid, no court should ever accomplish by writ of *mandamus*."). Because the plaintiffs effectively sought to test the right of their successors to those positions, the dissent concluded that their "exclusive remedy is *quo warranto*," not *mandamus*. *Id.* at 270. In Justice Cohen's view, where the issue is title to office, "due process demands that the succeeding office holder be accorded ample notice of and opportunity to appear in proceedings which seek to declare vacant the office of which he is the current occupant." *Id.* Given what it deemed the "patent non-joinder of necessary parties in interest" here, the dissent would have affirmed the trial court's order and required the plaintiffs to proceed

The *Bentman* Court erred in relying upon *Smith v. Allwright* to support its novel jurisdictional hook, and its error becomes even more apparent in light of more than half-a-century of subsequent decisional law from the High Court clarifying the limits on governmental interference with the associational rights of political parties.

*Smith* was a seminal decision concerning the Fifteenth Amendment's prohibition against state laws burdening the franchise on the basis of race. But it can only be understood in the context of a series of challenges to Southern primaries decided in the decades that preceded it. In 1924, Texas law declared that black people could not participate in the Texas Democratic Party's primaries, notwithstanding provisions of the Texas Constitution setting the qualifications for electors that did not exclude black voters from the ballot box. In *Nixon v. Herndon*, 273 U.S. 536 (1927), the Supreme Court unanimously held that Texas' statutory denial of the primary ballot to Dr. Lawrence A. Nixon, a black physician and member of the Democratic Party, violated the Equal Protection Clause of the Fourteenth Amendment. When the Texas Legislature reenacted the law, it gave the executive committee of a state party "the power to prescribe the qualifications of its members for voting or other participation." *Smith*, 321 U.S. at 658. The executive committee of the Texas Democratic Party promptly adopted a resolution refusing to allow non-white voters to participate in its primary elections. Dr. Nixon sued once more, and the High Court

> again reversed the dismissal of the suit for the reason that the Committee action was deemed to be State action and invalid as discriminatory under the Fourteenth Amendment. The test was said to be whether the

---

in *quo warranto*, with their successors in office joined as necessary parties "pursuant to the principle of equity," so that "when the court has obtained jurisdiction of the subject matter, it shall include all parties to it and make a final determination of the whole." *Id.* at 271.

Committee operated as representative of the State in the discharge of the State's authority.

*Id.* (citing *Nixon v. Condon*, 286 U.S. 73 (1932)). However, "[t]he question of the inherent power of a political party in Texas 'without restraint by any law to determine its own membership' was left open." *Id.* at 659 (quoting *Nixon*, 286 U.S. at 83).

The Court confronted that open question in yet another Texas case, *Grovey v. Townsend*, 295 U.S. 45 (1935), which involved a racially exclusionary resolution adopted not by the executive committee but by a state convention of the Democratic Party. Because the *Grovey* Court considered the convention's "action [to be] unfettered by statutory control," the Court reached a different result than its *Nixon* decisions, unanimously holding "that to deny a vote in a primary was a mere refusal of party membership with which 'the state need have no concern.'" *Smith*, 321 U.S. at 659, 661 (quoting *Grovey*, 295 U.S. at 55).

Six years later, the Court decided *United States v. Classic*, 313 U.S. 299 (1941), which concerned the Democratic primary for Congress in Louisiana, where election commissioners, selected in accordance with state law, "willfully altered and falsely counted and certified the ballots." *Id.* at 307. Proclaiming "the right of qualified voters within a state to cast their ballot and have them counted at Congressional elections," *id.* at 315, the Court held that Article I, Section 4, of the U.S. Constitution empowered Congress to regulate both primary and general elections "where the primary is by law made an integral part of the election machinery." *Id.* at 318. In contrast with Congress' authority under the Fourteenth and Fifteenth Amendments, which is limited by the state action doctrine, *Classic* made clear that, because "the constitutional command" of Article I, Section 4, "is without restriction or limitation, the right" to cast a meaningful vote in

federal elections "is secured against the action of individuals as well as of states." *Id.* at 315. While the Court's earlier decisions did not rest on *Classic*'s newly-refined state action analysis, which focused on Congress' power to regulate federal elections, the elevation of the primary process to an indispensable preliminary stage for non-federal elections would prove essential to the Court's decision in *Smith*.

At issue in *Smith* was the denial of a primary ballot to a black voter during the 1940 Texas Democratic primary for state as well as federal offices. Since both the statutes regulating Texas' primaries and the Texas Democratic Party's exclusionary resolution limiting party membership to white citizens only largely had remained "the same in substance and effect . . . as they were when *Grovey v. Townsend* was decided," the Court had no choice but to reconsider that earlier decision, which upheld the exclusion of non-white voters "from primaries through the denial of party membership by a party convention." *Smith*, 321 U.S. at 661. In doing so, the Court found that the *Classic* scenario, whereby States "fus[e] . . . the primary and general elections into a single instrumentality for choice of officers," also "ha[d] a definite bearing on the permissibility under the Constitution of excluding Negroes from primaries" for non-federal elections. *Id.* at 660. The Court reasoned that

> *Classic* bears upon *Grovey v. Townsend* not because the exclusion of Negroes from primaries is any more or less state action by reason of the unitary character of the electoral process but because the recognition of the place of the primary in the electoral scheme makes clear that *state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function that may make the party's action the action of the state*.

*Id.* (emphasis added).

Scrutinizing the State's election statues, the Court described how the Democratic Party's process for selecting its nominees for public office had become intertwined with Texas' laws governing general elections for the same. *Id.* at 662-63.

> We think that this statutory system for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election. The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party. . . . [I]t is state action which compels. When primaries become a part of the machinery for choosing officials, state and national, as they have here, the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election. If the state requires a certain electoral procedure, prescribes a general election ballot made up of party nominees so chosen and limits the choice of the electorate in general elections for state offices, practically speaking, to those whose names appear on such a ballot, it endorses, adopts and enforces the discrimination against Negroes, practiced by a party entrusted by Texas law with the determination of the qualifications of participants in the primary. This is state action within the meaning of the Fifteenth Amendment.
>
> The United States is a constitutional democracy. Its organic law grants to all citizens a right to participate in the choice of elected officials without restriction by any state because of race. This grant to the people of the opportunity for choice is not to be nullified by a state through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election. Constitutional rights would be of little value if they could be thus indirectly denied.

*Id.* at 663-64 (citations omitted).

While "[t]he privilege of membership in a party may be . . . no concern of a state," the Court concluded that when it is rendered "the essential qualification for voting in a primary to select nominees for a general election, the state makes the action of the party the action of the state." *Id.* at 664-65. Accordingly, "the well established principle of the Fifteenth Amendment, forbidding the abridgement by a state of a citizen's right to vote" on account of race, demanded that the permissive rule of *Grovey* yield to the preeminent

right of suffrage. *Id.* at 666. *Cf. Terry v. Adams*, 345 U.S. 461, 484 (1953) (Clark, J., concurring) ("[W]hen a state structures its electoral apparatus in a form which devolves upon a political organization the uncontested choice of public officials, that organization itself, in whatever disguise, takes on those attributes of government which draw the Constitution's safeguards in play.").[4]

*Bentman* shares few, if any, of the hallmarks of the foregoing precedents. First and foremost, *Smith* and its antecedents were principally concerned with *race-based* discrimination that barred non-white voters from participating in party primaries for public office, where those primaries, by law, had become an "integral part of the election machinery" for choosing state and federal officers. *Smith*, 321 U.S. at 659-60 (citing *Classic*, 313 U.S. at 318). There were no such claims in *Bentman*. The plaintiffs were not prohibited from voting in the Democratic Party's primary for public offices in Philadelphia County or elsewhere, nor did they assert that their right to vote had been impacted by considerations of race or any other suspect classification limiting the "privilege of membership" in the local party. *See id.* at 664-65. In fact, *Bentman* makes no mention of the Fifteenth Amendment, on which *Smith* was grounded, or the Equal

---

[4]     The Court capped off this line of cases with *Terry*, which involved the Jaybird Democratic Association of Fort Bend County, Texas, a "self-governing voluntary club" that limited membership to whites since its inception in 1889. 345 U.S. at 462 (plurality). Following what the three-Justice opinion announcing the judgment of the Court described as "a plan purposefully designed to exclude Negroes from voting and at the same time escape the Fifteenth Amendment's command," the Jaybirds intentionally held their whites-only primary a month or so ahead of the Democratic Party's primary; Jaybird-endorsed candidates then "nearly always" ran in and won the Democratic primary and general election "without opposition." *Id.* at 463-64. Although eight Justices agreed that this practice violated the rights of non-white voters because the elections subsequent to the Jaybird primary had "become no more than the perfunctory ratifiers of the choice that ha[d] already been made" in a racially discriminatory process ostensibly beyond the State's control, *id.* at 469, no rationale garnered majority support.

Protection Clause, which animated both *Nixon* decisions. *Cf. Lynch*, 343 F.2d at 372 ("Whether the equalitarian requirement of the Fourteenth Amendment extends to procedural alternatives of primary elections, and particularly to such post-primary emergency nominations . . ., may well be doubted.").

To be clear, the state action prerequisite in those federal cases was satisfied by Texas' delegation of the power to set voter qualification to the state Democratic Party, and its implicit ratification of the party's invidious racial discrimination in its primary process, which together effectively precluded black voters from ever electing the candidates of their choice at a time when the Lone Star State was under one-party control. The Supreme Court expressly endorsed this reading of *Smith* and *Terry* in *California Democratic Party v. Jones*, 530 U.S. 567 (2000). There, the Court explained that those decisions "held only that, when a State prescribes an election process that gives a special role to political parties, it 'endorses, adopts and enforces the discrimination against Negroes' that the parties . . . bring into the process—so that the parties' discriminatory action becomes state action under the Fifteenth Amendment." *Id.* at 573 (emphasis added; citations omitted).[5] The *Bentman* plaintiffs faced nothing of the kind.

In the absence of a suspect classification, the *Bentman* Court instead relied upon a creative interpretation of the Fourteenth Amendment's Due Process Clause. Specifically, the Court considered membership on a party committee to be "an important

---

[5]     The same discriminatory practices almost certainly would fail strict scrutiny under the fundamental-rights framework of the High Court's contemporary Equal Protection jurisprudence. *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

right and privilege," the deprivation of which triggers constitutional protections because it dispossesses the office holder of a "concomitant right of participation in the selection of public officers." *Bentman*, 218 A.2d at 269. Perhaps cognizant of the novelty of its holding, the Court cautioned that jurisdiction is established only when the deprivation "bears such a direct and substantial relationship to the electoral process as to be a matter of judicial concern." *Id.* (capitalization altered). Setting aside the apparent malleability of this "standard," central to the Court's reasoning was its determination that, by promulgating Section 812 of the Election Code, the General Assembly in 1947 "recognized a" theretofore unknown "status in law in party committees and committeemen." *Id.* at 264-65. Yet the Court's epiphany was mistaken, as political parties, party officers, and their constituent committees already were recognized "in law" when the Election Code was adopted in 1937. *See* Act of June 3, 1937, P.L. 1333. Not only did that Act codify a definition of "political party," it set forth a comprehensive series of qualifications and procedures for electing party officers.[6]

Neither the promulgation of the Election Code in 1937 nor the addition of Section 812 a decade later disturbed this Court's conclusion in *Kearns* that "[t]he right to be a member [of a party committee] is not conferred by any statute." *Kearns*, 41 A. at 274

---

[6] *See, e.g.*, Act of June 3, 1937, P.L. 1333, art. VIII, § 801 ("Definition of political parties and political bodies"); *id.* § 802 ("No person who is not registered and enrolled as a member of a political party shall be entitled to vote at any primary of such party or to be elected or serve as a party officer, or a member or officer of any party committee . . . ."); *id.* § 807 ("There may be in each county a county committee for each political party within such county, the members of which shall be elected at the spring primary, or appointed, as the rules of the respective parties within the county may provide. . . ."); *id.* § 810 ("Candidates for . . . party offices [other than for the office of member of the State or National Committee], who receive a plurality of the votes of the party electors at a primary, shall be the party officers of their respective parties.").

("Membership [on a party committee] is a privilege which may be accorded or withheld, and not a right which can be gained independently, and then enforced."). Contrary to the *Bentman* Court's view, Section 812 did not imbue committee membership—*i.e.*, party office—with constitutionally protected status. If anything, it simply confirmed the truism that the "duly elected or appointed members" of those committees "shall be subject to the control, direction and supervision of the political committee of which they are members." 25 P.S. § 2842. In other words, party officers serve at the party's pleasure. But to reach the contrary result in *Bentman*, the Court unnecessarily resorted to tools of statutory construction where none was called for, because the statute was unambiguous on the matter. By its plain terms, Section 812 commits the "control, direction and supervision" of elected or appointed committee members to the committee itself. *Id.* Interpreting that clear command so as to permit the removal of elected committee members "without legal cause" would, in the *Bentman* Court's view, "reach a result patently absurd and unreasonable" in violation of the United States and Pennsylvania Constitutions. 218 A.2d at 267. I disagree.

Section 812 is clear: without exception, local party officers are subject to the "control, direction and supervision" of the local party committee. There simply was no cause to invoke absurdity in *Bentman*, because that interpretative canon is inapplicable unless two limiting conditions are satisfied, neither of which applies to that statute. *See Commonwealth v. Peck*, 242 A.3d 1274, 1286-87 (Pa. 2020) (Wecht, J., concurring) (noting that "the ostensible absurdity 'must consist of a disposition that no reasonable person could intend,'" and that it "'must be reparable by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial

error'") (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 237-38 (2012)). There is nothing absurd or unreasonable about a political party disciplining its officers, including by way of removal from office, for violating the party's internal bylaws, ignoring assigned duties, or contravening committee endorsements. That authority exists independent of the Election Code. Indeed, parties are not required to provide any public justification for removing individuals from party office. And it certainly is not for the courts to second-guess those decisions, even when the grounds for discipline might appear to be pretextual.

It is well-settled that political parties have the right to protect themselves "from intrusion by those with adverse political principles." *Ray v. Blair*, 343 U.S. 214, 221-22 (1952). That necessarily includes "the freedom to identify the people who constitute the association, and to limit the association to those people only." *Democratic Party of the United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 (1981).[7] In *La Follette*, the Supreme Court cautioned that "the stringency, and wisdom, of membership requirements is for the association and its members to decide—not the courts—so long as those requirements are otherwise constitutionally permissible." 450 U.S. at 123 n.25. While *Smith* and *Classic* concerned racial discrimination, the principles expounded by the

---

[7] *See Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents."); *accord Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973) ("There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. . . . The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom."); *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968) ("And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States.").

High Court in those decisions, as refined by *Harper* and its progeny, undoubtedly prohibit political parties from using many other classifications, suspect or not, to discriminate against those who wish to enroll as party members—so long as party membership remains the "essential qualification" for utilizing the State's primary election machinery.

That was not the situation confronting the *Bentman* Court, however, because party *member*, as those federal cases understood the term, was not synonymous with party *officer*, which is what Article VIII of the Election Code is concerned with. It is one thing to concede, as we must, that a political party has a constitutional obligation to tolerate individual memberships (however undesirable a given enrollee may be) so that eligible electors may exercise their right to participate in the electoral process. But that concession does not mean that courts can foist unwelcome *officers* upon the organization merely because those officers infrequently might have a role in selecting nominees for special elections to fill vacancies in public offices, no matter how removed from the ultimate selection they are. A political party's right to control its own leadership is sacrosanct.[8]

That Cox and Shuchman were, like Mohn, *elected* committee members is of no moment. In *Cousins v. Wigoda*, 419 U.S. 477 (1975), and *La Follette*, the States of Illinois and Wisconsin, respectively, contended that state election law should be accorded primacy over the national Democratic Party's rules for determining the qualifications and

---

[8]    In that sense, endeavoring to resolve internal party disputes against the party is akin, for First Amendment purposes, to "[r]equiring a church to accept or retain an unwanted minister," which the courts cannot do. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n*, 565 U.S. 171, 188-89 (2012) (recognizing the "ministerial exception" to certain employment anti-discrimination laws).

eligibility of delegates to the Democratic National Convention, notwithstanding the fact that the States held their elections for delegates in a manner contrary to the national party's rules. The Supreme Court pointedly rejected Illinois' assertion, adopted by the intermediate appellate court, that "'protecting the effective right to participate in primaries is superior to whatever other interests the party itself might wish to protect.'" *Cousins*, 419 U.S. at 488 (quoting *Wigoda v. Cousins*, 302 N.E.2d 614, 629 (Ill. App. Ct. 1973)). While the Court acknowledged that the State's interests were "legitimate," they were not sufficiently "compelling" to justify abridging the right of political association enjoyed by the national party to exclude slates of delegates selected in contravention of party rules. *Id.* at 489; *cf. La Follette*, 450 U.S. at 114 (concluding that Wisconsin's interest in "maintaining the special feature of its primary . . . which permits private declaration of party preference"—a feature the State claimed was necessary to "preserv[e] the overall integrity of the electoral process, provid[e] secrecy of the ballot, increas[e] voter participation in primaries, and prevent[] harassment of voters"—did not "justify its substantial intrusion into the association freedom of members of the National Party").

If the asserted interest of honoring the election results for party delegates deliberately chosen in order to participate in the quadrennial nomination of a candidate for President of the United States was not compelling enough to override a political party's First Amendment associational freedom to exclude, how can we continue to maintain that an elected party officer has a vested, judicially enforceable right not to be excluded from party office on the grounds that one day he *might* participate in a committee process for nominating candidates to fill vacancies in county public office, as *Bentman* requires? We can't, or at least shouldn't. *Bentman* is irreconcilable with the First Amendment, and has

been since its inception. *Cousins*, *La Follette*, and *Jones* make that much clear. *See Jones*, 530 U.S. at 573 (rejecting "the proposition that party affairs are public affairs free of First Amendment protections"). Of course, the *Bentman* Court lacked the benefit of these landmark precedents in 1966. But that is no excuse for persisting in our error now that we have the opportunity to correct it, which we may do *sua sponte*. *See Freed v. Geisinger Med. Ctr.*, 97 A.2d 1202, 1212 (Pa. 2009), *on reargument*, 5 A.3d 212, 215 (Pa. 2010) ("[T]here is no absolute jurisprudential bar to this Court's *sua sponte* reconsideration of precedent."). As *Bentman* knitted a jurisdictional rule from whole cloth on specious grounds, reconsideration would be entirely appropriate now, notwithstanding that we have not been asked to do so. *See* Maj. Op. at 17.

Today's Majority makes a salutary effort to save *Bentman* by adopting a "narrower" interpretation of its jurisdictional decree, under which "an individual must point to some discrete acts or actions entailing state action to establish the required direct-and-substantial nexus." *Id.* Respectfully, that standard will always be untenable as it pertains to disciplining party officers. The Election Code gives both political parties and political bodies the authority to nominate candidates to fill vacancies for public office outside of the traditional primary election process in limited circumstances. *See* 25 P.S. § 2953(a). At any moment, a vacancy could arise that directly calls for the performance of some substantial "public function" by a party committee—*e.g.*, selecting a substitute nominee. *Bentman*, 218 A.2d at 266. Were the removal process for any party officer to occur too close in time to a vacancy in public office, as was the (albeit *sui generis*) case in *Bentman*, the threat of costly litigation and court intervention could saddle the committees with officers whose interests are not aligned with those of the party. I can think of few burdens

on a party's associational rights more severe than subjecting a party's "control, direction and supervision" of its officers to the whims of the judiciary. Judges are not in a better position than party members to determine the "right time" for disciplining or culling derelict officers. And even if we thought we were, we may not "constitutionally substitute [our] own judgment for that of the Party." *La Follette*, 450 U.S. at 123-24.

The judiciary must remain mindful that the General Assembly authorized the use of the primary election ballot to fill party offices as a matter of convenience to political parties, not so as to exert greater control over them. Indeed, the Election Code expressly recognizes the parties' right to dispense with elections for party office, if they so choose, and to govern themselves by appointment alone if they "deem [it] expedient." *See* 25 P.S. § 2837. While the courts have the power to resolve election contests conducted with the Commonwealth's "election machinery," there simply is no individual "right" to persist in party office that is enforceable against the collective will of the party to select different leaders. Although it is true that removal proceedings necessarily have the harsh effect of "nullifying" the results of a prior election, "the proper forum for determining intraparty disputes" of this nature is the party itself, not the courts. *Cousins*, 419 U.S. at 491. Because there is no way to harmonize *Bentman* with the Supreme Court's binding First Amendment precedent, we only invite further mischief in derogation of constitutional mandates by refusing to overrule it.